UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RALPH M. WATSON,<br><br>                              Plaintiff,<br><br>                    v.<br><br>NY DOE 2, ILLINOIS DOE 1,<br><br>                              Defendants. | 19 Civ. 533 (DEH)<br><br>**OPINION<br>AND ORDER** |

DALE E. HO, United States District Judge:

Plaintiff Ralph M. Watson brought this action for defamation against Defendants NY Doe 2 and Illinois Doe 1 (collectively, "Defendants")[1] based on statements they made in 2018 accusing him of sexual harassment and/or assault.   Compl. ¶¶ 34-53, ECF No. 1.   Defendants counterclaimed, arguing that they are entitled to attorney's fees under New York's anti-SLAPP ("Strategic Lawsuits Against Public Participation") law because Watson brought his claims without a substantial basis in fact and law. Before the Court are three motions for summary judgment: (1) NY Doe 2's motion for summary judgment dismissing Watson's claims against her and granting her counterclaim, ECF No. 274; (2) Illinois Doe 1's motion for summary judgment dismissing Watson's claims against her and granting her counterclaim, ECF No. 281; and (3) Watson's cross-motion for partial summary judgment granting his defamation claims against Illinois Doe 1, ECF No. 298.   For the reasons that follow, NY Doe 2's motion is **GRANTED**, Illinois Doe 1's motion is **GRANTED**, and Watson's motion is **DENIED**.

---

[1] NY Doe 2 and Illinois Doe 1 were granted leave to proceed pseudonymously under a protective order.  *See* ECF No. 93.

**BACKGROUND**

I.    **The Summary Judgment Submissions**

Before turning to the facts, the Court briefly addresses the parties' compliance with the Court's Local and Individual Rules in their summary judgment submissions.

To begin with, in opposition to NY Doe 2's Local Civil Rule 56.1 Statement, Watson submitted a seventy-seven-page counterstatement of facts, sixty-six pages of which are spent responding to NY Doe 2's fifteen-page statement of material facts. *See* Watson's Resp. to NY Doe 2's Statement of Undisputed Material Facts ("Pl.'s NYD SOF"), ECF No. 300. Watson responds to numerous statements provided by NY Doe 2 with "[u]ndisputed but clarified," followed by a lengthy narrative of additional facts that do not contradict the statement in question. *See id.* ¶¶ 5-9, 11-13, 15, 17, 22-26, 29-31, 34, 35, 39, 40, 43, 47, 51, 60-62, 73, 82, 87. Watson offers similar "clarifications" in response to Illinois Doe 1's Local Rule 56.1 Statement. *See* Watson's Resp. to Illinois Doe 1's Loc. Civ. R. 56.1 Statement of Material Facts ("Pl.'s ID SOF") ¶¶ 8, 13, 14, 16, 28, 41, 42, ECF No. 302. In all such instances, because Watson acknowledges at the outset that the statements in question are undisputed, the Court will treat them as such. *See* Loc. Civ. R. 56.1(c); *Washington v. City of New York*, No. 05 Civ. 8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (taking the statement of facts provided by defendants "as true" where plaintiffs' initial response in each instance was "Admit, but deny to the extent the statement cites to inadmissible evidence").

Watson's lengthy "clarifications," which spin and supplement facts he does not genuinely dispute, are not permitted under Local Rule 56.1. Likewise, even where Watson does purport to raise a factual dispute, his responses often add lengthy narratives but fail to cite to admissible evidence controverting the statement in question, as required by Local Rule 56.1. *See, e.g.*, Pl.'s NYD SOF ¶ 19. "The Local Rule does not contemplate a free-for-all of adding irrelevant facts

2

and facts unnecessary to the proper adjudication of a summary judgment motion." *Emanuel v. Gap, Inc.*, No. 19 Civ. 3617, 2022 WL 3084317, at *4 (S.D.N.Y. Aug. 3, 2022). "[T]here is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important." *Tripathy v. McCloskey*, No. 21 Civ. 6584, 2024 WL 2135623, at *1 (S.D.N.Y. May 13, 2024); *see also Goldstick v. The Hartford, Inc.*, No. 00 Civ. 8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (finding 56.1 statement noncompliant where it "adds argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"); *Graves v. Deutsche Bank Sec., Inc.*, 548 F. App'x 654, 657 n.2 (2d Cir. 2013) (holding that 127-page response to five-page statement of facts "flagrantly violated Local Civil Rule 56.1, which requires a short and concise, non-argumentative response").

Watson's Local Rule 56.1 responses are, "whether so intended or not, a manifest evasion of the page limitation on plaintiff's memorand[a] in opposition to the motion[s] for summary judgment." *Goldstick*, 2002 WL 1906029, at *1. Page limits exist for a reason. The parties "cannot simply dump papers on the court and expect the court to sift through them to determine if some nugget is buried somewhere in that mountain." *Tyson v. Town of Ramapo*, No. 17 Civ. 4990, 2023 WL 3044623, at *1 (S.D.N.Y. Apr. 21, 2023). Nevertheless, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Although both Defendants take issue with Watson's extraneous supplementation, neither moves to strike any portion of his Local Rule 56.1 responses. Accordingly, the Court will accept Watson's submissions and will draw from Watson's

factual elaborations where necessary to the fair adjudication of this case. But the Court will disregard any statements of fact that are irrelevant or otherwise inappropriate to consider here.[2]

## II.    Factual Background

The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the cross-motions for summary judgment, including NY Doe 2's Rule 56.1 Statement of Undisputed Material Facts ("NYD SOF"), ECF No. 276; Watson's Response to NY Doe 2's Statement of Undisputed Material Facts ("Pl.'s NYD SOF"), ECF No. 300; NY Doe 2's Reply to Watson's Rule 56.1 Response ("NYD SOF Reply"), ECF No. 310; Illinois Doe 1's Rule 56.1 Statement of Material Facts ("ID SOF"), ECF No. 282; Watson's Response to Illinois Doe 1's Rule 56.1 Statement of Material Facts ("Pl.'s NYD SOF"), ECF No. 302; and Illinois Doe 1's Reply to Watson's Rule 56.1 Response ("ID SOF Reply"), ECF No. 307, as well as the affidavits, deposition testimony, and other exhibits attached to the motion papers. Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. The facts recounted below are undisputed except where otherwise noted.

### A.    NY Doe 2's Time at CP+B

In July 2015, at the age of 23, NY Doe 2 was hired as a junior-level art director at the advertising agency Crispin Porter & Bogusky ("CP+B") in Boulder, Colorado. NYD SOF ¶ 1.[3] Watson, who was 47 years old at the time, was Chief Creative Officer at CP+B. NYD SOF ¶¶ 2-

---

[2] Without requesting leave, Watson also submitted thirty-eight pages of evidentiary objections to NY Doe 2's and Illinois Doe 1's statements of fact. *See* Watson's Obj. to NY Doe 2's Evid. ("Pl.'s NYD Evid. Obj."), ECF No. 301; Watson's Obj. to Illinois Doe 1's Evid. ("Pl.'s ID Evid. Obj."). The Court will resolve these objections, where necessary, in footnotes in the fact section below. The Court will not consider Watson's surreplies. *See* ECF Nos. 314, 315.

[3] Watson objects to this and numerous other statements of fact on grounds of relevance under Federal Rule of Evidence ("FRE") 401. *See* Pl.'s NYD Evid. Obj.; Pl.'s ID Evid. Obj. Because relevance under FRE 401 "is a low threshold, easily satisfied," *United States v. Gramins*, 939 F.3d 429, 450 (2d Cir. 2019), all of Watson's objections based on relevance are overruled.

3. Prior to joining CP+B, Watson had held top creative roles at several distinguished advertising agencies and had received multiple awards for his work in advertising. NYD SOF ¶ 4. By January 18, 2018, Watson was leading all the creative teams at CP+B and earning over $500,000 per year. Pl.'s NYD SOF ¶ 110. As CP+B's Chief Creative Officer, Watson had supervisory responsibilities that include hiring, bonuses, discipline, and terminations for around 70 employees in the creative department, including NY Doe 2. Pl.'s NYD SOF ¶ 100.

Watson evaluated NY Doe 2's work. NYD SOF ¶ 5. From September 2016 until she left CP+B in December 2016, NY Doe 2 was on probation imposed by Watson for performance problems. NYD SOF ¶ 6; Watson SUF ¶ 103.

On December 3, 2016, after a night of drinking, Watson stripped down to his underwear and got into a hot tub with NY Doe 2, which he acknowledged was inappropriate and said he would not do in hindsight. NYD SOF ¶ 8. Watson does not dispute this, but he contends that several other people were in the hot tub with him and NY Doe 2 on the evening of December 3, 2016. Pl.'s NYD SOF ¶ 7, 8.

Soon after that, when NY Doe 2 gave her two weeks' notice that she was leaving CP+B, Watson invited her out for drinks at a bar in Boulder called Finkel & Garf Brewing Co. NYD SOF ¶ 9. Watson and NY Doe 2 kissed at Finkel & Garf. NYD SOF ¶ 12. Watson later went with NY Doe 2 and another female junior CP+B employee, Anonymous Witness 1, back to NY Doe 2's apartment, where he stayed and smoked marijuana for over an hour. NYD SOF ¶ 13. Watson took a photo of NY Doe 2 and Anonymous Witness 1 while he was at NY Doe 2's apartment. NYD SOF ¶ 14. Again, Watson does not dispute these statements of fact, but he offers additional statements that do not contravene them, and he contends that "NY Doe 2 admitted that she did not have a great memory from Finkel & Garf." Pl.'s NYD SOF ¶ 9.

NY Doe 2 testified that she was uncomfortable during her encounters with Watson on the night of the hot tub incident and the night they went to Finkel & Garf but was wary of antagonizing him given his stature in the advertising industry.  NYD SOF ¶ 16; *see* Jaffre Decl. Ex. 1 ("NY Doe Tr.") at 48:6-10, ECF No. 277-1.  Watson disputes that NY Doe 2 actually felt uncomfortable the night they went to Finkel & Garf.  Pl.'s NYD SOF ¶ 16.[4]  He contends that statements made by Anonymous Witness 1, who observed them at Finkel & Garf and later accompanied them to NY Doe 2's apartment, "directly contradicted NY Doe 2's version of the events of the night."  Pl.'s NYD SOF ¶¶ 12, 153.  Specifically, Anonymous Witness 1 stated in a declaration that she did not see Watson "overtly hitting" on NY Doe 2 at Finkel & Garf but that she did observe "flirty gestures" from NY Doe 2 toward Watson.  Pl.'s NYD SOF ¶¶ 12, 154.  She declared that she "did not see a kiss in full" but did see NY Doe 2 "lean in close to [Watson's] face."  Pl.'s NYD SOF ¶¶ 12, 154.  She further stated that NY Doe 2 "appeared comfortable, confident and secure" at the brewery and "could have but did not signal, text or ask [Anonymous Witness 1] to help her exit the conversation."  Pl.'s NYD SOF ¶¶ 12, 153.  She declared that when they stopped by NY Doe 2's apartment later in the evening, NY Doe 2 "willingly invited [Watson] to come inside," and that when they left the apartment, NY Doe 2 "asked" Watson to continue on to the next bar with them.  Pl.'s NYD SOF ¶¶ 156-57.  Anonymous Witness 1 recalled that she "went home not feeling comfortable with the actions [she] witnessed [NY Doe 2] take that evening."  Pl.'s NYD SOF ¶ 157.  Nevertheless, Anonymous Witness 1 did not observe the kiss between Watson and NY Doe 2 at Finkel & Garf and never discussed with NY Doe 2 how the latter felt about Watson.  Pl.'s

---

[4] In disputing NY Doe 2's statement of fact that she was uncomfortable during these encounters, and at multiple other points in his summary judgment submissions, Watson attempts to insert evidence of NY Doe 2's prior sexual history.  This evidence is plainly inadmissible under FRE 412, which provides that "evidence offered to prove that a victim engaged in other sexual behavior" and "evidence offered to prove a victim's sexual predisposition" are inadmissible in civil proceedings "involving alleged sexual misconduct."  Fed. R. Evid. 412(a).

NYD SOF ¶¶ 15, 17.  NY Doe 2 does not dispute that Anonymous Witness 1's declaration contains the language quoted in Watson's counterstatement of facts, but she disputes that the declaration is accurate.  NYD SOF ¶¶ 153-57; NY Doe 2 Tr. 52:4-54:4 (stating that Anonymous Witness 1 "can have whatever impression she took of that night," but disagreeing with various aspects of her account).

NY Doe 2 testified that she felt sexually harassed by Watson while she was at CP+B.  NYD SOF ¶ 18.  Watson disputes this, pointing out that she did not report any of her allegations to CP+B while she was employed there, and citing the testimony of Anonymous Witness 1 that NY Doe 2 appeared relaxed on the evening of December 3, 2016.  Pl.'s NYD SOF ¶ 18.

### B.    Events After NY Doe 2's Departure from CP+B

NY Doe 2 left CP+B in December 2016.  NYD SOF ¶ 6.  In February 2017, a male CP+B employee reported to CP+B Human Resources that he was concerned about inappropriate behavior Watson had displayed toward NY Doe 2 and another female subordinate employee.  NYD SOF ¶ 20.[5]  CP+B interviewed the male employee, who reported that Watson had publicly asked a female

---

[5] Watson argues that the exhibits cited in support of this statement have not been properly authenticated under FRE 901 and are inadmissible hearsay under FRE 801-803.  As to authentication, NY Doe 2's counsel swore that each document was a true and correct copy of a document produced by Watson in discovery, and Watson offers no specific reason to doubt their authenticity.  This objection is therefore overruled, as are Watson's authenticity objections to documents he himself produced.  *See PharmacyChecker.com v. Nat'l Ass'n of Bds. of Pharmacy*, No. 19 Civ. 7577, 2023 WL 2973038, at *4 (S.D.N.Y. Mar. 28, 2023); see *Faulkner v. Arista Recs. LLC*, 797 F. Supp. 2d 299, 307 (S.D.N.Y. 2011) (where "Plaintiffs produced the documents and are thus in the best position to know whether they are indeed authentic," argument that document may be inauthentic "teeters on the edge of sanctionable").

Watson argues that the exhibits documenting CP+B's interview with the male employee are inadmissible hearsay and not admissible under the business records exception.  Pl.'s NYD Evid. Obj. ¶ 5.  But, as NY Doe 2 explains, the Court "need not resolve" at this stage whether the business records exception applies because "material relied on at summary judgment need not be admissible in the form presented to the district court."  *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (quoting *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001)); *see* NY Doe 2's Resp. Pl.'s Evid. Obj. at 5, ECF No. 311.  NY Doe 2 represents that the evidence could be presented through testimony from a CP+B representative, which is sufficient at this stage to

subordinate whether she was a virgin in front of a large group of her colleagues.  NYD SOF ¶ 21.

CP+B Human Resources interviewed Watson about this accusation; Watson admitted it was true,

and that his behavior was "bad," "wrong," and "very inappropriate."  NYD SOF ¶¶ 22-24.  During

the interview, Watson further admitted that he and NY Doe 2 had kissed at Finkel & Garf, although

he accused NY Doe 2 of initiating the kiss.  NYD SOF ¶ 25.  At one point during the interview,

Watson asked, "Am I fired?" and "Do I need a lawyer?"  NYD SOF ¶ 26.

In March 2017, CP+B Human Resources personnel separately contacted NY Doe 2, and

NY Doe 2 reported certain instances of Watson's inappropriate behavior toward her.  NYD SOF

¶ 27.  CP+B records indicate that, at the conclusion of the investigation, Watson was to be given

a written warning and to undergo ongoing harassment training.  NYD SOF ¶ 28.  Watson disputes

this; he avers that he never received such a warning and was never required to undergo any such

training.  Pl.'s NYD SOF ¶ 28.

---

consider the evidence on summary judgment.  *See id.* ("Here, the documents in question could readily be reduced to admissible form at trial through the testimony of the defendant officers as to the underlying events in question.").  Watson's citation to *Tradax Energy, Inc. v. Cedar Petrochemicals, Inc.*, 317 F.Supp.2d 373, 379 (S.D.N.Y. 2004), to argue that the exhibits needed to be accompanied by an affidavit of a person qualified to introduce the records at trial, is misplaced because that case predates 2010 amendments to the Rules that eliminated that requirement.  *See* Fed. R. Civ. P. 56(c)(2); *Brito v. Lucky Seven Rest. & Bar, LLC*, No. 19 Civ. 3876, 2021 WL 1131506, at *6-7 (S.D.N.Y. Mar. 24, 2021) (explaining that the amendments "removed the unequivocal requirement that documents submitted in connection with summary judgment be authenticated").

Moreover, the employee's statements within the exhibits relating to NY Doe 2 (that is, those to which Watson has not already admitted in his deposition) are not hearsay because they are not offered for the truth of the matter asserted but for the fact that CP+B received such complaints.  *See* NY Doe 2's Mem. Supp. Mot. Summ. J. ("NYD Mem.") at 18, ECF No. 275 (offering this fact only to argue that CP+B had an independent basis for wanting to fire Watson, thereby undermining his tortious interference with contract claim).

Watson's objections are overruled, as are his duplicative objections to other similar CP+B records.  *See* Pl.'s NYD Obj. ¶¶ 5-12, 31-32.

On April 5, 2017, Watson texted NY Doe 2 to tell her that he was on his way to New York City, where NY Doe 2 was then living, to judge an advertising competition. NYD SOF ¶ 32. NY Doe 2 agreed to meet him and a group of former CP+B colleagues. NYD SOF ¶ 33. NY Doe 2 testified that she agreed to meet up with Watson because of his stature in the industry. NYD SOF ¶ 33. On April 7, 2017, Watson, NY Doe 2, and others went out drinking at the Back Room Bar, and then went to dinner, where they drank some more. NYD SOF ¶¶ 34-35. NY Doe 2 contends that she was intoxicated; Watson disputes this, pointing to his testimony that NY Doe 2 did not appear intoxicated and that he did not observe her drinking excessively. NYD SOF ¶ 36; Pl.'s NYD SOF ¶ 36.

Watson and NY Doe 2 then went up to his hotel room. NYD SOF ¶ 37; Pl.'s NYD SOF ¶ 37. NY Doe 2 contends that Watson took her up, while Watson counters that it was her idea. NYD SOF ¶ 37; Pl.'s NYD SOF ¶ 37. NY Doe 2 avers that she did not want to engage in sexual activity with Watson and was too intoxicated to consent to sexual activity with him. NYD SOF ¶ 38.[6] Watson disputes this, arguing that NY Doe 2 "consensually and voluntarily became physical with Watson" and did not appear intoxicated. Pl.'s NYD SOF ¶ 38. Watson and NY Doe 2 kissed on the couch in Watson's hotel room. NYD SOF ¶ 39. Watson had an e-cigarette, also known as a vape pen, with him in his hotel room. NYD SOF ¶ 40. NY Doe 2 took a hit from his vape pen. NYD SOF ¶ 42. Aspects of NY Doe 2's memory are fragmented after that. NYD SOF ¶ 43. NY

---

[6] Watson objects to the evidence cited in support of this statement on the grounds that "NY Doe 2 lacks the personal knowledge to provide competent testimony on the issue of anything that happened in the hotel room with Watson, given her repeated statements reflecting differing recollection[s] of the alleged incident." Pl.'s NYD Evid. Obj. ¶ 16. This objection is overruled. NY Doe 2 is competent to testify to events she herself experienced, and any objection based on her memory of those events would ultimately go to weight (which the Court does not assess in this posture), not admissibility. Watson's similar objections to NY Doe 2's testimony based on lack of personal knowledge and speculation are likewise overruled. Similarly, his objections that her testimony is self-serving would also go to weight, not admissibility. *See St. Pierre v. Dyer*, 208 F.3d 394, 405 (2d Cir. 2000).

Doe 2 contends that this was due to her intoxication, but Watson disputes that she was intoxicated based on his own observation of her. NYD SOF ¶ 43; Pl.'s NYD SOF ¶ 43. Watson testified that there was no marijuana in the vape pen. Pl.'s NYD SOF ¶ 42.

What happened next is largely disputed. NY Doe 2 testified that she remembers Watson kissing her on the couch, Watson performing oral sex on her, and Watson's naked body on top of her naked body in his bed. NYD SOF ¶ 44. She testified that the next morning, she woke up in Watson's bed without all of her clothes on. NYD SOF ¶ 45. She testified that she could feel that some part of Watson's body had been inside of her body and that she "knew something was deeply wrong." NYD SOF ¶¶ 46, 48. NY Doe 2 testified that she genuinely believes Watson raped her by having sex with her when she was too incapacitated to consent. NYD SOF ¶ 52.

By contrast, Watson testified that after he and NY Doe 2 kissed on the couch, he did not get on top of her, did not digitally penetrate her, did not perform oral sex on her, and did not have penetrative sex with her. Pl.'s NYD SOF ¶ 44. He testified that he did not remove her clothing and that, the next morning, he did not believe her to be naked because he could see a bra strap and a sock sticking out from under the covers. Pl.'s NYD SOF ¶ 45. In disputing NY Doe 2's account of the evening, Watson notes that in a statement later provided to CP+B, NY Doe 2 said, "I remember entering Mr. Watson's room, but because of my intoxicated state, I do not recall precisely what happened thereafter." Pl.'s NYD SOF ¶ 44. He further notes that NY Doe 2 later testified that she "blacked out inside of the [hotel] room." Pl.'s NYD SOF ¶ 44.

Later that morning, after Watson left the hotel room to judge the advertising competition, NY Doe 2 ordered room service breakfast and watched Die Hard on the hotel television for approximately an hour. NYD SOF ¶ 47. Watson does not dispute this, but he notes that NY Doe 2 initially told CP+B in October 2018 that she had left the hotel room "as quickly as possible" after Watson left that morning. Pl.'s NYD SOF ¶ 47.

On November 23, 2017, NY Doe 2 texted Watson to wish him a happy Thanksgiving. NYD SOF ¶ 49. She sent the same text to at least twenty-six other individuals in her professional network. NYD SOF ¶ 50. NY Doe 2's expert, Dr. Sara Boyd, opined that "[v]ictims engage in a variety of 'counterintuitive' behaviors in the aftermath of a sexual assault," and that "it is not unusual for victims to initiate or maintain post-assault contact with perpetrators, particularly where the perpetrator was known to the victim before the assault." NYD SOF ¶ 51.[7] Watson's expert, Dr. Lama Bazzi, opined that "a hypothetical victim of sexual assault, through cognitive dissonance, could sincerely believe that they had been assaulted." Pl.'s NYD SOF ¶53 (paraphrasing Dr. Bazzi's testimony). Dr. Bazzi further opined, based on her review of the underlying materials, that NY Doe 2's behavior fit the cognitive dissonance model. NYD SOF Reply ¶53.

## C.    Diet Madison Avenue

Around the end of 2017, a group of anonymous individuals started an Instagram account called Diet Madison Avenue ("DMA") to collect stories of sexual harassment and discrimination in the advertising industry. NYD SOF ¶ 54. On January 12, 2018, at the urging of a former CP+B coworker who had heard NY Doe 2's account of Watson's sexual assault, NY Doe 2 decided to

---

[7] Watson objects to the admissibility of Dr. Boyd's expert report on the grounds that it is unverified, conclusory, and non-probative. Pl.'s NYD Evid. Obj. ¶ 24. These objections are overruled. Although Dr. Boyd's report is unsworn, "subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment." *Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 539 (4th Cir. 2015)). Here, Dr. Boyd ratified her expert report during her deposition. *See* Jaffré Reply Decl. Ex. 60 (Boyd Tr.) at 40:13-16, 138:10-140:5. Watson's objections that Dr. Boyd's opinion should not be considered because it is not "conclusive evidence," Pl.'s NYD Evid. Obj. ¶ 24, go to weight (which the Court does not assess on summary judgment), rather than admissibility.

message DMA about Watson.  NYD SOF ¶¶ 55-56.[8]  NY Doe 2 communicated with the DMA

Instagram account via direct message, sharing her account of how Watson sexually harassed her

while she was employed at CP+B and how he sexually assaulted her in New York City.  NYD

SOF ¶ 56.  In a direct message, DMA told NY Doe 2 that she was the eighth person to contact

DMA about Watson.  NYD SOF ¶ 57.[9]  On various dates throughout January 2018, DMA

published a series of "stories" on Instagram, alleging, among other things, that they had

"[c]orroborated" reports that "Ralph Watson" was an "unrepentant serial predator" who "targeted

& groomed" women who "were young & just starting out their careers."  NYD SOF ¶ 58.  In a

January 19, 2018 message to a friend following DMA's post about the allegations against Watson,

NY Doe 2 stated: "I want to cry.  But I'm happy he won't be able to do this to anyone else."  NYD

SOF ¶ 59.  Watson does not dispute the fact of any of these communications, but he disputes the

truth of the allegations.  Pl.'s NYD SOF ¶ 58.

### D.    Watson's Termination

On January 24, 2018, CP+B convened an employee town hall regarding sexual harassment

and discrimination.  NYD SOF ¶ 60.  That same day, CP+B's human resources department

interviewed Watson regarding several complaints against him, including reports it had received

from "a few people" following the town hall about a widespread belief that employees had to sleep

---

[8] Watson objects to the evidence cited in support of this statement, but the evidence is offered not for the truth of any statements by the coworker but for the fact that he made the statements to NY Doe 2.  *See* Fed. R. Civ. P. 801(c).  The objection is therefore overruled.

[9] Watson objects that this is inadmissible hearsay, *see* Pl.'s NYD Evid. Obj. ¶ 29, but the evidence is offered to show that DMA made this statement to NY Doe 2, not that the statement was true.  *See* Fed. R. Civ. P. 801(c).  Perhaps because Watson's efforts to obtain the identities of the anonymous individuals behind DMA were unsuccessful, *see* ECF No. 239, neither party has offered evidence as to the truth or falsity of DMA's statement that NY Doe 2 was the eighth person to contact them about Watson.  Similarly, the exhibits consisting of DMA's Instagram stories are admissible, though they may not be considered for their truth.  *See* Pl.'s NYD Evid. Obj. ¶ 30.

with Watson in order to be promoted.  NYD SOF ¶ 61.[10]  Watson told CP+B human resources that

he had only slept with one CP+B employee (who was not NY Doe 2), but only after she left CP+B.

NYD SOF ¶ 62.[11]  Watson later admitted in his deposition that he had in fact had a sexual

relationship with that employee while she was still employed at CP+B.  NYD SOF ¶ 62.

That same day, NY Doe 2's friend at CP+B put NY Doe 2 in touch with the new CP+B

Director of Creative Management, Jan Jensen.  NYD SOF ¶ 64.  NY Doe 2 spoke with Jensen by

phone on January 25, 2018.  NYD SOF ¶ 65.  NY Doe 2 relayed to Jensen her account of Watson's

sexual harassment at CP+B and sexual assault in New York City (hereinafter, the "CP+B

Statement").  NYD SOF ¶ 66.[12]  Jensen's notes from the interview describe NY Doe 2's allegations

of sexual assault as follows: "[NY Doe 2] told me she remembers the lobby of his hotel.  She

remembers sitting on the couch in his hotel room.  He asked her to take a hit off his Vaporizer

pipe, but the next thing she remembers is waking up naked in his hotel bed.  She feels she was

drugged and raped, although she remembers nothing."[13]  Pl.'s NYD SOF ¶ 136; Jaffre Decl. Ex.

---

[10] Watson objects that this is hearsay, *see* Pl.'s Obj. ¶ 31, but the evidence is admissible to the extent that they show that the complaints were made to CP+B, not to show that they were true. Accordingly, Watson's objection is overruled.

[11] Watson objects that this is hearsay, but he admitted that he made these statements in his deposition, *see* Watson Tr. 144:15-19.  In any event, they are statements of a party opponent, and the interview notes are admissible as business records for purposes of this motion.  *See infra* n.13.

[12] Although Watson attempts to dispute "that NY Doe 2 informed Jensen that she was sexually assaulted," Pl.'s NYD SOF ¶ 66, the report of sexual assault to CP+B appears to be one of the two statements by NY Doe 2 that form the basis of Watson's defamation claims.  *See Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 163 (S.D.N.Y. 2020).  It is unclear how Watson can both dispute that NY Doe 2 told Jensen she was sexually assaulted and maintain his claim based on defamation per se.

[13] NY Doe 2 argues that Jensen's notes from the interview are inadmissible under the business records exception to the hearsay rule, FRE 806(3), because they were prepared in anticipation of litigation.  *See* NYD Reply at 6-7.  Indeed, there are certain indicia in the exhibit itself that Jensen anticipated litigation, including her notes that NY Doe 2 "does not want to testify in court" and that "I asked for her permission to tell . . . our legal counsel the details around her story so that we could take action."  Ayotte Decl. Ex. HH at 4, ECF No. 304-8.  Nevertheless, the Second Circuit has observed that "Rule 803(6) favors the admission of evidence rather than its

HH ("Jensen Interview Notes") at 3, ECF No. 304-8.  NY Doe 2 disputes that she told Jensen that Watson "drugged" her or that she "remember[ed] nothing."  NYD SOF Reply ¶ 136.

On February 2, 2018, CP+B fired Watson.  NYD SOF ¶ 70.  On March 22, 2018, in response to an inquiry from Watson's attorney, CP+B explained that its decision was based on an "in-depth investigation of allegations of misconduct by several current and former employees," as well as "identification of emails that were sent by Mr. Watson."  NYD SOF ¶ 71.

On May 22, 2018, Watson filed the first of three lawsuits arising out of these events, suing DMA and 100 Doe defendants for defamation and related torts in California Superior Court, seeking not less than $10 million in damages.  NYD SOF ¶ 73.  On May 23, 2018, Watson published an open letter defending himself on his attorney's website, and Watson's attorney made statements on Watson's behalf to the press.  NYD SOF ¶¶ 74, 76.

On May 24, 2018, DMA messaged NY Doe 2 about Watson's California lawsuit and sent her an article quoting Watson's attorney.  NYD SOF ¶¶ 78-79.  DMA wrote, "We really don't think that this will go anywhere / But where do you stand if it does."  NYD SOF ¶ 80.  NY Doe 2 responded, "I don't think so either.  But if it does ... I'm so angry / Gloves are off. I don't care if the industry knows he raped me" (ellipses in original).  NYD SOF ¶ 81.  DMA posted this statement to Instagram as a "story" (hereinafter, the "DMA Statement").  NYD SOF ¶ 82.

---

exclusion if it has any probative value at all." *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010).  Here, NY Doe 2 has herself offered similar exhibits consisting of notes from other interviews taken during CP+B's investigations into sexual harassment, suggesting that these interview notes were all taken in the regular course of business. *See* Fed. R. Evid. 803(6). Although CP+B likely anticipated litigation more imminently in January 2018, two months before they fired Watson, than they did in 2017, any investigation into allegations of sexual harassment comes with it some possibility of litigation, and it is unclear where the line should be drawn here. It seems to the Court that it would be unfair to exclude notes from the one interview Watson wishes to rely on while considering similar exhibits offered by NY Doe 2.  Accordingly, the Court will consider for purposes of this motion Jensen's account of NY Doe 2's statements in the interview (which themselves are not hearsay because they are statements of an opposing party, *see* Fed. R. Evid. 801(d)(2)).

On June 29, 2018, Watson filed his second of three lawsuits arising out of these events, suing CP+B and related parties for breach of contract, employment discrimination, and other torts in the United States District Court for the District of Colorado, again seeking not less than $10 million in damages.  NYD SOF ¶¶ 83-85.  The lawsuit was then moved to arbitration.  NYD SOF ¶ 86.  Despite previously having asked Jensen for anonymity, on or around October 22, 2018, NY Doe 2 agreed to allow CP+B to reveal her identity to Watson in the context of that arbitration. NYD SOF ¶ 87.  NY Doe 2, through her attorneys, provided a statement for use in the arbitration describing the events she had substantially conveyed to Jensen several months earlier about the sexual harassment and assault.  NYD SOF ¶ 88.  Watson disputes the contents of the statement, which he argues contradict various details in her deposition testimony.  Pl.'s NYD SOF ¶ 88.

### E.    Illinois Doe 1's Social Media Posts

Illinois Doe 1 is a resident of the State of Illinois.  ID SOF ¶ 2.  On or around February 2, 2018, Illinois Doe 1 came across another person's public Facebook account, where an Adweek article reporting on the termination of Watson's employment had been shared.  ID SOF ¶ 7.  In the comments of the Facebook post sharing the article, Illinois Doe 1 commented that "9 women reported" Watson.  ID SOF ¶ 8; Grech Decl. Ex. C at 6,[14] ECF No. 284-3.  She also posted a screenshot of an Instagram story by DMA stating that "nine particular women" had "shared painful stories with us" (hereinafter, the "Facebook Comments").   ID SOF ¶ 9; Grech Decl. Ex. C at 6.

On May 25, 2018, Illinois Doe 1 shared a post on her Instagram account linking to a GoFundMe webpage for DMA and stating, "@DietMadisonAvenue needs our help to fight Ralph Watson's defamation law suit.  All donations can be made anonymously.  I figure it's the next best

---

[14] The pin cites are to the PDF pagination.

thing to giving money directly to his victims." (hereinafter, the "GoFundMe Statement").  ID SOF ¶ 16.

Illinois Doe 1 was herself a victim of sexual harassment in the workplace.  ID SOF ¶ 11. Illinois Doe 1 had previously reported her sexual harassment experience to DMA and, at that time, had discussed DMA's vetting process with them.  ID SOF ¶¶ 12-13.  DMA represented to Illinois Doe 1 that upon receiving a complaint from an individual, DMA would investigate the allegations, see how many people were involved, and see who could corroborate the story; it would not rely solely on one person's allegations.  ID SOF ¶ 14[15]; Grech Decl. Ex. D ("Illinois Doe 1 Tr.") at 43:9-16 (stating that when "someone came to [DMA] with their experience," they "wouldn't just, you know, believe one person," but "checked to see how many people were involved, who could corroborate the story").  Watson disputes whether DMA in fact engaged in any vetting with respect to the allegations against him.  Pl.'s ID SOF ¶ 14

Illinois Doe 1 states that, based on her prior experiences with DMA, she trusted DMA's process and reporting.  ID SOF ¶ 15.  Watson disputes this, noting that Illinois Doe 1 testified in her deposition that she never discussed with DMA whether the allegations against Watson were vetted or corroborated and was not familiar with the details of the allegations.  Pl.'s ID SOF ¶ 15. He further notes that Illinois Doe 1 stated that she would not be surprised to learn that DMA posted NY Doe 2's story in real time.  Pl.'s ID SOF ¶ 15.

## III.    Procedural History

On January 17, 2019, Watson brought this lawsuit against NY Doe 2, Illinois Doe 1, and others, seeking not less than $10 million in damages.  Compl., ECF No. 1.  On February 11, 2020,

---

[15] Watson objects to the evidence of what DMA said to Illinois Doe 1 as hearsay, *see* Pl.'s ID Evid. Obj. ¶ 3, but the evidence is offered not for the truth of DMA's statements but for their effect on Illinois Doe 1.  The objection is therefore overruled.

the Honorable John G. Koeltl dismissed all defendants except NY Doe 2 and Illinois Doe 1. *See Watson v. NY Doe 1,* 439 F. Supp. 3d 152 (S.D.N.Y. 2020). Judge Koeltl dismissed all claims against NY Doe 2 except defamation and tortious interference with contract, and dismissed all claims against Illinois Doe 1 except defamation. *See id.* He allowed Watson's defamation claims to proceed as to four specific statements: NY Doe 2's CP+B Statement (informing Jensen that she believed Watson raped her) and DMA Statement (telling DMA on Instagram, "I don't care if the industry knows he raped me"), and Illinois Doe 1's Facebook Comments (stating that "9 women reported" Watson) and GoFundMe Statement (stating that donating to DMA's legal fund was the "next best thing to thing to giving money directly to his victims"). *See id.* at 162, 165.

In late 2020, the New York legislature amended its anti-SLAPP[16] statute to broaden the definition of a SLAPP to include any lawsuit based on "any communication in a place open to the public or a public forum in connection with an issue of public interest" or "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition." N.Y. Civ. Rights Law § 76-a(1)(a). Under the amendments, "'[p]ublic interest' shall be construed broadly, and shall mean any subject other than a purely private matter." *Id.* § 76-a(1)(d).

On August 19, 2021 and October 8, 2021, respectively, Illinois Doe 1 and NY Doe 2 each amended her answer to assert a counterclaim for attorneys' fees and costs pursuant to the amended anti-SLAPP statute, N.Y. Civil Rights Law § 70-a and § 76-a. *See* ECF Nos. 195, 204, 205. On October 6, 2023, Judge Koeltl denied Watson's motion to dismiss the counterclaims. *See* Opinion

---

[16] SLAPPs, or strategic lawsuits against public participation, are lawsuits that have "little legal merit but are filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future." *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 933 n.1 (N.Y. 1992).

& Order, ECF No. 249.  On October 12, 2023, this action was reassigned to the undersigned.  *See* ECF No. 50.

NY Doe 2 and Illinois Doe 1 each moved for summary judgment on July 19, 2024.  ECF Nos. 274, 281.  At the time, Watson had not yet answered their counterclaims.  *See* ECF No. 286.  On July 26, 2025, Watson sought leave to file belated answers to their counterclaims, which this Court granted.  Order, ECF No. 291.  The Court asked the parties to discuss whether Watson's answers mooted out, provided cause to withdraw, or otherwise changed the scope of their motions for summary judgment, and to file a joint status letter if so.  *Id.*  In response, NY Doe 2 rested on her summary judgment papers and Illinois Doe 1 struck those portions of her Local Rule 56.1 Statement and Memorandum of Law that were premised solely on the allegations in her counterclaims.  *See* Letter, ECF No. 296.  The Court ordered the parties to brief the summary judgment motions in accordance with the previously ordered schedule.  *See* Order, ECF No. 297.

On October 18, 2024, the parties filed a joint letter seeking to maintain portions of their summary judgment filings under seal.  *See* ECF No. 320.

## LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[17]  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at

---

[17] In all quotations from cases, the Court omits citations, footnotes, emphases, internal quotation marks, brackets, and ellipses, unless otherwise indicated.

trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, the court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Johnson*, 680 F.3d at 236. But the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in his pleading . . . or on conclusory statements." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I.    Watson's Defamation Claims

#### A.    Applicable Level of Fault

Under New York law, the elements of defamation are: (1) "a defamatory statement of fact," (2) "that is false," (3) "published to a third party," (4) "'of and concerning' the plaintiff," (5) "made with the applicable level of fault on the part of the speaker," (6) "either causing special harm or constituting [defamation] per se," and (7) "not protected by privilege." *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001). Here, both NY Doe 2 and Illinois Doe 1 argue that Watson has failed

to establish a genuine issue of material fact as to whether they had the applicable level of fault to satisfy the fifth element of his defamation claim—namely, that they acted with actual malice.

The applicable level of fault in a defamation case is governed by constitutional, common-law, and statutory principles.  Under the First Amendment, a public official may not recover damages for a defamatory statement related to his official conduct "unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). The same standard has been extended to public figures and to those "who are not public figures for all purposes may still be public figures with respect to a particular controversy," i.e., limited-purpose public figures. *Contemp. Mission, Inc. v. N.Y. Co.*, 842 F.2d 612, 617 (2d Cir. 1988).  To determine whether a plaintiff is a limited-purpose public figure, courts consider whether the plaintiff has: (1) "successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation"; (2) "voluntarily injected himself into a public controversy related to the subject of the litigation"; (3) "assumed a position of prominence in the public controversy"; and (4) "maintained regular and continuing access to the media." *Id.*

The constitutional standard of actual malice does not necessarily apply to private figures; "rather, 'the States may define for themselves the appropriate standard of liability' for those individuals." *Gottwald v. Sebert*, 220 N.E.3d 621, 627 (N.Y. 2023) (quoting *Gertz v Robert Welch, Inc.*, 418 US 323, 347 (1974).  "In New York, the accepted standard for private figures is negligence." *Id.*

Notwithstanding the common-law negligence standard, New York's anti-SLAPP statute provides that a plaintiff in any "action involving public petition and participation" must establish actual malice by clear and convincing evidence. *Id.* at 631 (quoting N.Y. Civ. Rights Law § 76-a).  Although the statute previously defined "an action involving public petition and participation"

narrowly to include only claims "brought by a public applicant or permittee," the legislature amended the anti-SLAPP statute in 2020 to extend its protections to a broader class of individuals. *Id.* (quoting N.Y. Civ. Rights Law § 76-a). The statute now defines "an action involving public petition and participation" to include any lawsuit based on "any communication in a place open to the public or a public forum in connection with an issue of public interest" or "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition." N.Y. Civ. Rights Law § 76-a(1)(a). "'Public interest' shall be construed broadly, and shall mean any subject other than a purely private matter." *Id.* § 76-a(1)(d).

There is no question that the statements at the heart of this case were "in connection with an issue of public interest." *Id.* § 76-a(1)(a). Judge Koeltl concluded as much when he held that the statements by NY Doe 2 and Illinois Doe 1 addressed "the #MeToo movement and the abuses that occur in the workplace due to gender and power dynamics." *Watson v. NY Doe 1*, No. 19 Civ. 533, 2023 WL 6540662, at *4 (S.D.N.Y. Oct. 6, 2023); *see also id.* at *5. Watson concedes that the amended anti-SLAPP statute and its actual malice standard govern his claims in this case.[18]

---

[18] *See* Pl.'s Combined Opp'n & Cross-Mot. Partial Summ. J. ("Pl.'s Opp'n") (applying actual malice standard without mentioning common-law negligence standard), ECF No. 298; Pl.'s Reply Supp. Cross-Mot. Partial Summ. J. at 1 & n.1 (stating that Illinois Doe 1 "correctly contends" that Watson must prove actual malice and that, "[b]ased on the retroactive application of the New York anti-SLAPP statutes," he "did not oppose" her arguments based on that standard), ECF No. 313. Any argument that New York's amended anti-SLAPP law and its actual malice standard do not apply to this action would be waived, in any event, because Watson has conceded their application in his prior filings in this case. *See* Pl.'s Mem. Supp. Mot. Dismiss Illinois Doe 1's Counterclaim at 12, ECF No. 207 (describing "the applicable actual malice standard" under the amended anti-SLAPP law as the relevant standard); Pl.'s Mem. Supp. Mot. Dismiss NY Doe 2's Counterclaim at 12, ECF No. 222 (same).

Accordingly, the Court will apply the actual malice standard in resolving the cross-motions for summary judgment.[19]

### B.    Actual Malice

"Actual malice" requires a plaintiff to establish by clear and convincing evidence that the communication on which the action was based "was made with knowledge of its falsity or with reckless disregard of whether it was false."  N.Y. Civ. Rights Law § 76-a(2); *see N.Y. Times*, 376 U.S. at 279-80.  "Reckless disregard as to falsity means that the statement is made with a high degree of awareness of the publication's probable falsity or while the defendant in fact entertained serious doubts as to the publication's truth."  *Albert*, 239 F.3d at 272; *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013).  "Clear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to opposing presumptions."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells*

---

[19] To be sure, neither the New York Court of Appeals nor the Second Circuit has explicitly decided whether the anti-SLAPP statute's expanded application of the actual malice standard applies to actions, like this one, that were pending at the time of amendment.  *See Gottwald v. Sebert*, 220 N.E.3d 621 (N.Y. 2023) (declining to "address whether the provision of the amended statute imposing [the actual malice] standard applies to actions pending at the time of its enactment" because plaintiff was a limited-purpose public figure); *Palin v. N. Y. Times Co.*, 113 F.4th 245, 263 (2d Cir. 2024) (declining to decide "whether the Anti-SLAPP Statute's amendment applies retroactively" because "the First Amendment and New York's amended Anti-SLAPP Statute share the same substantive requirement" of actual malice and plaintiff was a public official).  Several district courts in the Second Circuit, however, have held that it does.  *See, e.g.*, *Coleman v. Grand*, 523 F. Supp. 3d 244, 258 (E.D.N.Y. 2021); *Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 27 (S.D.N.Y. 2020).  In any event, because Watson concedes that the actual malice standard applies, the Court need not and does not decide whether it applies because of the anti-SLAPP statute, because Watson is a limited-purpose public figure, because certain statements were privileged, or all of the above.  By failing to respond to Defendants' arguments that he is a limited-purpose public figure and that certain statements were privileged, Watson has waived any argument that the actual malice standard does not apply for those alternative reasons as well.  *See* NYD Mem. at 13-15 (privilege), 16-17 (limited-purpose public figure); Illinois Doe 1's Mem. Supp. Summ. J. at 9-10 (privilege), ECF No. 283; Pl.'s Opp'n (failing to address NY Doe 2's limited-purpose public figure and privilege arguments and appearing to concede Illinois Doe 1's privilege argument).

*Fargo Sec., LLC*, 13 F.4th 247, 260 (2d Cir. 2021). Actual malice, "even by way of recklessness, is a difficult standard to meet, and quite purposefully so." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 277 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015). "Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (*citing Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991)).

"[A] court ruling on a motion for summary judgment must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Anderson*, 477 U.S. at 257. "It is not enough for the plaintiff merely to assert 'that the jury might, and legally could, disbelieve the defendant's denial of legal malice.'" *Contemp. Mission*, 842 F.2d at 621-22 (quoting *Anderson*, 477 U.S. at 256). As the Supreme Court has explained, "discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion." *Anderson*, 477 U.S. at 256-57. Rather, "a plaintiff opposing a fully supported motion must offer 'concrete evidence from which a reasonable juror could return a verdict in his favor.'" *Contemp. Mission*, 842 F.2d at 621 (quoting *Anderson*, 477 U.S. at 256)). "This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257.

"Although actual malice is subjective, a court typically will infer actual malice from objective facts." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000). Actual malice can be established through, *inter alia*, "the defendant's own actions or statements, the dubious nature of his sources, and the inherent improbability of the story." *Id.* "Generally, 'mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth.'"

23

*Dongguk Univ.*, 734 F.3d at 124 (quoting *Gertz*, 418 U.S. at 332).  "The reckless conduct needed to show actual malice 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing,' but by whether there is sufficient evidence 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'"  *Behar*, 238 F.3d at 174 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

### C.    Application

#### 1.    NY Doe 2

NY Doe 2 moves for summary judgment on Watson's defamation claims, arguing that he cannot prove that she acted with actual malice when she made the two statements in question.  *See* NY Doe 2's Mem. Supp. Mot. Summ. J. at 8, 10-13, ECF No. 275.  Although she continues to maintain that her statements were in fact true, she notes that for purposes of her summary judgment motion, the Court need only decide the issue of actual malice.  *See id.*

In response, Watson offers three categories of evidence that he contends raise a triable issue of material fact as to actual malice: (1) testimony from Anonymous Witness 1 that contradicts NY Doe 2's account of the night she and Watson went to Finkel & Garf; (2) actions taken by NY Doe 2 in the wake of the alleged assault that, in Watson's view, are inconsistent with having been sexually assaulted; and (3) changes in NY Doe 2's telling of the details of the alleged sexual assault.  The Court will address each category in turn.

##### a.    *The Events at Finkel & Garf in Boulder*

Watson argues that Anonymous Witness 1's account of the night when Watson and NY Doe 2 went to Finkel & Garf for farewell drinks in Boulder "directly contradicted NY Doe 2's allegations" regarding Watson's behavior that evening.  Pl.'s Opp'n at 10-11.  Specifically, he points to Anonymous Witness 1's statements that:

- "NY Doe 2 wasn't 'desperately searching' for a friend to protect her at Finkel and Garf . . . NY Doe 2 appeared comfortable, confident and secure. She could have but did not signal, text or ask me to help her exit the conversation." Pl.'s Opp'n at 11 (citing Pl.'s SOF ¶ 153).

- "[Anonymous Witness 1] did not see Watson begin 'overtly hitting' on NY Doe 2 or 'putting his hand on [her] thigh in a sexually suggestive manner,' or lean in to kiss NY Doe 2 on the mouth. Instead, she stated that she 'did not see sexual manner from [Watson] but I did see flirty gestures from NY Doe 2. I did not see a kiss in full, but I did see NY Doe 2 lean in close to [Watson's] face." *Id.* (citing Pl.'s SOF ¶ 154).

- "[Watson] was invited by NY Doe 2 to go out and meet some other friends downtown." *Id.* (citing Pl.'s SOF ¶ 155).

- "NY Doe 2 'willingly invited [Watson] to come inside. [Watson] seemed like he wanted to leave and was uncomfortable, looking for a polite way to exit once inside.'" *Id.* (citing Pl.'s SOF ¶ 156).

- "When the three of us exited NY Doe 2's house to meet up with friends, NY Doe 2 asked [Watson] to continue with us, but [Watson] said he wanted to go home, and we parted ways . . . I went home not feeling comfortable with the actions I witnessed her take that evening." *Id.* (citing Pl.'s SOF ¶ 157).

Anonymous Witness 1's testimony, however, is ultimately immaterial, because NY Doe 2's statements about the events that evening are not at issue in Watson's defamation suit. As noted, the only statements by NY Doe 2 are her "two statements accusing [Watson] of raping her" several months later in New York. *Watson*, 439 F. Supp. 3d at 163. Perhaps, viewing the evidence in the light most favorable to Watson, a reasonable jury could infer that NY Doe 2's memory of the night she and Watson went to Finkel & Garf is not reliable. But that would not constitute clear and convincing evidence of actual malice as to statements she made about an entirely different occasion in a different city, where Anonymous Witness 1 was not present.

        *b.*     *The Aftermath of the Alleged Assault*

Watson argues that the evidence of NY Doe 2's behavior after waking up in Watson's hotel room on the morning of April 8, 2017, and in the following months, "wholly undermines NY Doe 2's allegations that she was raped by Watson." Pl.'s Combined Opp'n & Cross-Mot. Partial Summ. J. ("Pl.'s Opp'n") at 10, ECF No. 298. Watson points to the following pieces of evidence:

- "Rather than being 'drugged and raped' and leaving Watson's hotel room as soon as Watson left it, where she cried at her office all day, NY Doe 2 actually ordered room service and watched a movie (Die Hard) in Plaintiff's hotel room after he left the room." Pl.'s Opp'n at 10 (citing Pl.'s NYD SOF ¶¶ 146-147).

- "That same morning, at a time she had previously claimed to have spent traumatized and crying all day, she posted a picture of the New York City skyline (allegedly taken from Watson's hotel room) on her Instagram account with the caption 'I LOVE NY.'" *Id.* (citing Pl.'s NYD SOF ¶ 148).

- "Further, rather than being traumatized by a sexual assault and avoiding Watson, in the days Watson remained in New York, NY Doe 2 invited [him] to brunch, liked multiple of his Instagram posts, and twice invited him out to drinks with her alone." *Id.* (citing Pl.'s NYD SOF ¶ 149).

- "After he left New York, they continued to have normal interactions via text messages." *Id.* (citing Pl.'s NYD SOF ¶ 150).

- "Five months after the alleged rape, she texted him that she felt 'rejected,' and then laughingly attempted to FaceTime him with a friend late at night." *Id.* (citing Pl.'s NYD SOF ¶ 151).

- "In late November of 2017, she texted him 'Happy Thanksgiving' and included a funny picture of the cast of 'Friends.'" *Id.* (citing Pl.'s NYD SOF ¶ 152).

This evidence, in Watson's view, creates a genuine dispute of material fact as to NY Doe 2's actual malice.

The Court disagrees. Watson points to no evidence, beyond his own hypothesis, that ordering room service, watching a movie, posting on Instagram, and maintaining friendly contact with one's assailant in the aftermath of a sexual assault are somehow proof that the assault never happened. He does not, for example, offer any expert opinion that such behavior indicates that a person has lied about being sexually assaulted. NY Doe 2's expert, Dr. Boyd, stated to the contrary that "[v]ictims of sexual violence engage in complex self-protective coping strategies—including avoidance, suppression, dissociation, and other forms of emotional management—to endure difficult or intolerable situations." Jaffré Ex. 29 (Boyd Report) at 18. Dr. Boyd also cited literature showing that "it is not unusual for victims to initiate or maintain post-assault contact with perpetrators, particularly where the perpetrator was known to the victim before the assault." *Id.* at

17. And Watson's expert, Dr. Bazzi, opined that NY Doe 2's behavior was indicative of cognitive dissonance.[20]  Watson's evidence is at best "equivocal" and "open to opposing presumptions," *Loreley*, 13 F.4th at 260, such as the presumption that NY Doe 2's behavior reflected complex coping strategies or cognitive dissonance rather than actual malice.  A reasonable jury could not infer from this evidence that it is "highly probable," *id.*, that NY Doe 2 lied or subjectively entertained serious doubts about whether she was raped, as required to find actual malice by clear and convincing evidence.

       *c.*      *NY Doe 2's Account of the Alleged Assault*

Finally, Watson points to what he describes as NY Doe 2's "ever-changing and self-serving testimony," Pl.'s Opp'n at 22, and specifically inconsistencies in her account of how much she remembers from that night and what she did the next morning.

Watson observes that according to interview notes taken by Jan Jensen in January 2018— the accuracy of which is disputed[21]—NY Doe 2 initially said that "she remembers nothing, though she feels that she was drugged and raped."  Pl.'s NYD SOF ¶ 136; Jensen Interview Notes at 3.  Then, in a statement provided to CP+B's attorneys in October 2018, she stated, "I remember entering Mr. Watson's room, but because of my intoxicated state, I do not recall precisely what happened thereafter."  Pl.'s Opp'n at 23 (quoting Ayotte Decl. Ex. II ("CP+B Statement") at 5, ECF No. 304-9).  These statements, Watson argues, are at odds with NY Doe 2's "deposition testimony in May 2021 that although [she] 'blacked out,' she now recalls that Watson performed

---

[20] According to NY Doe 2, Dr. Bazzi also testified that "a victim's 'behavior with the perpetrator after the assault doesn't necessarily mean that the assault did not happen.'"  NYD Reply at 4 (quoting Jaffré Reply Ex. 59 (Bazzi Tr.) at 124:16-19, ECF No. 312-1).  Because this particular page range is not contained in the exhibit cited in NY Doe 2's brief, however, the Court cannot rely on this purported testimony.

[21] NY Doe 2 observes that "Watson did not ask NY Doe 2 in her deposition whether she said that to Jensen, and did not bother to depose Jensen at all."  NYD Reply at 6 (footnote omitted).

oral sex on her, laid naked on top of her naked body, and that she 'could feel that some part of Watson's body had been inside of her body the night before.'"  Pl.'s Opp'n at 22 (quoting NYD SOF ¶¶ 44-46).  NY Doe 2, meanwhile, readily acknowledges that "[a]spects of [her] memory are fragmented after [she took a hit from the vape pen] due to her intoxication."  NYD SOF ¶ 43.

Assuming without deciding that a jury were to find Jensen's interview notes reliable, it could not reasonably infer actual malice from these inconsistencies.  A jury could infer that NY Doe 2 did not fully recall the events of that evening at the time that she made her statements to CP+B, or that she concealed parts of what she remembered at that time from CP+B managers.  Such inferences would be supported by expert testimony in the record indicating that "[v]ictims of sexual assault may [] lack clear memories or have spotty memories of the assault due to the trauma they experienced," Boyd Report at 14, and that, "when a victim does disclose his or her sexual assault, it is not uncommon for the victim to make incremental disclosures," Boyd Report at 7.  But to then conclude that NY Doe 2 consciously or recklessly lied about being sexually assaulted would require an inferential leap unsupported by any evidence in the record—namely, any evidence indicating that she in fact knew that this was not true or that she entertained serious doubts as to truth of her statements.  Put another way, the Jensen interview notes are an insufficient basis to resist summary judgment because they do not constitute "evidence that is neither equivocal nor open to opposing presumptions."  *Loreley*, 13 F.4th at 260.

*Palin v. New York Times Co.*, 113 F.4th 245, 263 (2d Cir. 2024), is instructive.  There, the Second Circuit reversed the district court's grant of Rule 50 judgment in favor of the *Times* in a defamation action brought by former Alaska Governor and Vice Presidential candidate Sarah Palin based on an editorial stating that there was a "clear" and "direct" "link" between a shooting that injured Congresswoman Gabby Giffords and a digital graphic published by Palin's political action committee, which placed crosshairs over twenty congressional districts, including Giffords'.  *See*

*id.* at 255-56.  The Circuit held that the question of actual malice must go to the jury because, in part, the opinion editor had stated that "I didn't think then and don't think now that the [crosshairs] map caused [the shooter] to act."  *Id.* at 263 (first emphasis in original).  This statement could "permissibly be read to suggest that [the editor] entertained serious doubts as to his assertion that the map and shooting had a 'clear' and 'direct' 'link.'"  *Id.*  Here, by contrast, there is no comparable statement by NY Doe 2 in the record that she "didn't think then" or does not "think now" that she was raped.  The statements on which Watson relies convey just the opposite: that in January 2018, NY Doe 2 "fe[lt] that she was drugged and raped," and in October 2018, she "kn[e]w . . . that Mr. Watson raped [her]."  Jensen Interview Notes at 3; CP+B Statement at 5.  A jury could not rationally infer from this testimony that NY Doe 2 subjectively believed her statements to be false or subjectively entertained serious doubts as to their truth.

As for the details of the following morning, Watson emphasizes how NY Doe 2's statement that "[a]fter Mr. Watson left the hotel room, [she] got dressed and left as quickly as possible," was later contradicted by evidence that she ordered room service, watched part of a movie, and posted a picture from the hotel room on Instagram with the caption "I LOVE NY" before leaving.  Pl.'s Opp'n at 23 (quoting Pl.'s NYD SOF ¶ 148).  NY Doe 2 contends that these discrepancies are the result of confusion between her and her lawyer at the time.  *See* NYD Reply at 3 n.5.  These inconsistencies, though relatively minor, could lead a jury to question whether NY Doe 2's account of the events in question is completely reliable.  But "discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion."  *Anderson*, 477 U.S. at 256-57.  Even if a jury were to discredit NY Doe 2's account of that night, disbelieving her testimony is not enough—there must be some "affirmative evidence" of actual malice.  *Id.* at 257.  The Supreme Court has emphasized that "[t]his is true even where the evidence is likely to be within the

possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery," *id.*, which Watson does not dispute he has had here.[22]

### d.    The Evidence as a Whole

Watson's three categories of evidence, viewed in their totality, fail to support his theory of actual malice. Even if a jury were to conclude that what happened to NY Doe 2 in Watson's hotel room was not rape—and, to be clear, the Court does not decide this, nor does it decide whether there is a triable issue of fact on the question of falsity—there is nothing in the record to suggest by clear and convincing evidence that she *knew* her statement was false or *entertained serious doubts* about its truth. "There is a significant difference between proof of actual malice and mere proof of falsity." *Contemp. Mission*, 842 F.2d at 621 (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 511 (1984)). "Liability requires clear and convincing evidence of a *knowing* falsehood or 'subjective awareness of probable falsity.'" *Id.* (quoting *Gertz*, 418 U.S. at 335 n.6).

Watson argues that "[i]f a jury finds that the evidence supports a finding that [NY Doe 2] was not sexually harassed or raped, it necessarily follows that NY Doe 2's allegations were made with actual malice, because she has firsthand knowledge of the events in question." Pl.'s Opp'n at 20. But he turns around and argues that NY Doe 2 "lacks the personal knowledge to provide competent testimony on the issue of anything that happened in the hotel room with Watson." Pl.'s NYD Evid. Obj. ¶¶ 16, 18-21, 25. The incoherence of Watson's theories highlights the absence of any evidence that NY Doe 2 lied. If, as Watson insinuates repeatedly in his evidentiary

---

[22] In addition to the three categories of evidence described above, Watson appears to argue that the fact that NY Doe 2 agreed that her 2016 probation was warranted and that Watson complained to CP+B about her without her knowledge makes it more likely that she lied about him assaulting her. *See* Pl.'s Opp'n at 8, 10, 18. It is unclear, and Watson does not explain, how these could support an inference of actual malice with respect to the statements at issue.

objections, NY Doe 2's intoxication impaired her memory of exactly what happened in his hotel room between when they kissed on the couch and when she woke up mostly undressed in his bed, it is difficult to see how a reasonable jury could infer actual malice from that fact.  Rather, the evidence is open to the obvious opposing presumption that, even in the absence of clear memories of what exactly had transpired, NY Doe 2 sincerely believed that she was sexually assaulted.  *See Loreley*, 13 F.4th at 260.  Under governing precedent, that is sufficient for summary judgment on the issue of actual malice.

Ultimately, Watson fails to articulate any theory of the evidence that would permit a reasonable jury to find actual malice by clear and convincing evidence.  He does not point to any evidence that NY Doe 2 lied or seriously doubted whether she was raped; rather, his argument comes down to vague and internally contradictory attacks on her credibility.  But "discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion." *Anderson*, 477 U.S. at 256-57; *see Contemp. Mission*, 842 F.2d at 621-22.  Because "the evidence presented in the opposing affidavits is of insufficient caliber [and] quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence," *Anderson*, 477 U.S. at 254, summary judgment is granted on Watson's defamation claim against NY Doe 2.

And because Watson's defamation claim against NY Doe 2 fails, so too necessarily does his tortious interference claim, which Watson has effectively waived by failing to oppose NY Doe 2's motion for summary judgment on that claim.

### 2.    Illinois Doe 1

Illinois Doe 1, too, moves for summary judgment dismissing Watson's defamation claims because the evidence cannot support a finding of actual malice.  *See* Illinois Doe 1's Mem. Supp. Mot. Summ. J. at 6-8, ECF No. 283.  Watson opposes the motion and cross-moves for summary judgment, arguing that "his evidence is so strong, and Illinois Doe 1's evidence is so weak, that

no reasonable jury could conclude that Illinois Doe 1's defamatory statement made on February 2 and May 25, 2018 were not defamatory and were not made with actual malice." Pl.'s Opp'n at 33-34.

The crux of Watson's argument is that Illinois Doe 1 relied solely on the posts of an unverified anonymous source, DMA, without seeing any corroborating evidence of their allegations. *Id.* at 31-32. He argues more specifically that:

- "[Illinois Doe 1] testified that she would not be surprised to learn that DMA posted NY Doe 2's story in real time and that she had no idea how many persons other than NY Doe 2 complained about Watson, as she 'wasn't involved in any of those conversations, so I don't know.'" Pl.'s Opp'n 32 (citing Pl's ID SOF ¶¶ 13-15) (emphasis omitted).

- "Illinois Doe 1 further admitted that at the time of her postings, she had no evidence or personal knowledge related to any of the alleged accusations against Watson." *Id.* (citing Pl's ID SOF ¶¶ 13-15).

- "She further admitted that with respect to DMA's claims that Watson was a 'serial predator,'[23] she had no idea of any information that DMA actually had to substantiate those claims and that the information DMA had would 'not [be] something that I would ask.'" *Id.* (citing Pl's ID SOF ¶¶ 13-15) (emphasis omitted).

Moreover, he contends that Illinois Doe 1's testimony that DMA had told her about its vetting process was self-serving and vague. *See id.* (citing ID SOF ¶ 13; Pl.'s ID SOF ¶ 13). Based on this evidence, he argues, "a reasonable jury could conclude that Illinois Doe 1 acted with actual malice in posting her defamatory statements and purposely avoided the truth, despite it being at her fingertips." *Id.* at 32-33.

The Court disagrees. To defeat summary judgment, Watson must provide affirmative evidence from which a jury could find with convincing clarity that Illinois Doe 1 entertained serious doubts as to the truth of her statements. He has not done so. Watson correctly notes that

---

[23] To be clear, no party argues that Illinois Doe 1 republished DMA's statement that Watson was a "serial predator," which appeared in a different Instagram story, *see* NYD SOF ¶ 58.

"a court typically will infer actual malice from objective facts," but he fails to provide "evidence of negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice," *Celle*, 209 F.3d at 183 (emphasis omitted). Contrary to Watson's apparent suggestion, the fact that DMA's statements were made anonymously does not automatically give rise to an inference of actual malice. Rather, "whether a story is . . . based wholly on an unverified, anonymous source" is a consideration "*relevant* to a showing that the defendant harbored actual malice." *Behar*, 238 F.3d at 174 (emphasis added) (citing *St. Amant*, 390 U.S. at 732).[24] Thus, the Supreme Court in *St. Amant* observed that a statement "based wholly on an unverified anonymous telephone call" was unlikely to be made in good faith. *Id*. But DMA is a far cry from an anonymous telephone caller. Illinois Doe 1 testified that she had previously reported her experience of sexual harassment in the advertising industry to DMA and discussed DMA's vetting process with them at the time. ID SOF ¶¶ 12-13. DMA told her that upon receiving a complaint, DMA would not rely on only one person's story but would investigate the allegations, see how many people were involved, and see who could corroborate the story. ID SOF ¶ 14. Though Watson avers that DMA never in fact corroborated the complaints against him, Pl's ID SOF ¶ 14, what is relevant to Illinois Doe 1's mental state is the representation DMA made to her, not whether it was actually true. Given Illinois Doe 1's undisputed testimony[25]

---

[24] Similarly, in the context of a motion to dismiss, "although failure to investigate does not in itself establish bad faith, reliance on anonymous or unreliable sources without further investigation *may* support an inference of actual malice." *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (emphasis added) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 733 (1968)).

[25] Watson argues that Illinois Doe 1's testimony is self-serving, see Pl.'s Opp'n at 32, but he offers no specific reason to doubt her credibility. In any event, "discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion." *Anderson*, 477 U.S. at 256-57.

regarding her understanding of DMA's process, DMA's anonymity alone is insufficient to establish actual malice.

Nor does Illinois Doe 1's failure to investigate the allegations against Watson demonstrate that she harbored substantial doubts as to their veracity. To be sure, a jury might find that Illinois Doe 1 acted imprudently in relying solely on DMA's prior assurances of corroboration rather than herself corroborating the claims against Watson. But "[t]he reckless conduct needed to show actual malice 'is not measured by whether a reasonably prudent [person] would have published, or would have investigated before publishing,' but by whether there is sufficient evidence 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [her] publication.'" *Behar*, 238 F.3d at 174 (quoting *St. Amant*, 390 U.S. at 731). Here, Watson has failed to provide sufficient clear and convincing evidence of actual malice on the part of Illinois Doe 1 to withstand summary judgment.

## II.    Defendants' Counterclaims

New York's anti-SLAPP statute creates a cause of action for the victim of a SLAPP suit to recover against the plaintiff. A defendant in a SLAPP suit "may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action." N.Y. Civ. Rights Law § 70-a(1). An award of attorney's fees shall be granted "upon a demonstration" that the SLAPP action "was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law." *Id.* § 70-a(1)(a).

The First Department has held, based on a thorough review of the legislative history, that a "substantial basis in fact and law" under New York's anti-SLAPP law "means such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact." *Reeves v. Associated Newspapers, Ltd.*, 218 N.Y.S.3d 19, 22 (App. Div. 1st Dep't 2024); *accord*

*Vitagliano v. Weiner*, 231 N.Y.S.3d 722, 724 (App. Div. 4th Dep't 2025).  The First Department explained that one "practical test" in applying the "substantial basis" standard is to ask "whether the allegations and evidence presented would require submission to a jury as a question of fact." *Reeves*, 218 N.Y.S.3d at 23.  In other words, the substantial basis test "has been equated with the ordinary summary judgment standard, in that each seeks to determine whether there are triable issues of material fact." *Id.*

Defendants argue that if the Court finds no triable issues of material fact and dismisses Watson's defamation claims, then he has necessarily continued a SLAPP action without a substantial basis in fact and law, and they are entitled to summary judgment on their anti-SLAPP counterclaims as well.  Watson does not appear to dispute this point; he, too, quotes the passage from *Reeves* equating the "substantial basis" standard to the ordinary summary judgment standard. *See* Pl.'s Opp'n at 14.[26]  Watson's primary argument seems to be that "anti-SLAPP statutes were designed to prevent the abuse of the judicial process by dismissing meritless lawsuits early in the litigation process, therefore saving the defendant from the burdens of a prolonged legal battle over baseless claims," but "Defendants are bringing their motions for summary judgment on their anti-SLAPP motions years into the litigation and after the case has been aggressively litigated." *Id.*

This is no argument at all.  By granting Defendants' motions for summary judgment on Watson's defamation claims today, the Court necessarily concludes that Watson's lawsuit had no substantial basis in fact or law.  Accordingly, the Court finds that it is Watson who has abused the judicial process and waged a protracted legal battle over baseless claims, and Defendants' motions for summary judgment on their anti-SLAPP counterclaims are granted.

---

[26] Watson also relies heavily on *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 Supp. 3d 267, 281-82 (E.D.N.Y. 2014), a case interpreting California's anti-SLAPP statute that is inapplicable here.

## III.    Sealing Requests

The parties seek to maintain certain redacted portions of their summary judgment filings under seal.  While "a presumption of access attaches to documents filed in connection with a summary judgment motion in a civil case," district courts must "balance competing considerations," including but not limited to "the privacy interests of those resisting disclosure." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120, 122 (2d Cir. 2006).  Having carefully reviewed the parties' proposed redactions, the Court concludes that the vast majority of the redactions are narrowly tailored and are necessary to preserve higher values.  The Court grants the joint sealing requests as follows:

- The Court grants the request to maintain NY Doe 2's, Illinois Doe 1's, and Anonymous Witness 1's anonymity.  Protecting these individuals' anonymity is warranted given the "highly sensitive and . . . personal nature" of the allegations in this case.  *Sealed Pl. v. Sealed Def.*, 537 F.3d 185, 190 (2d Cir. 2008).

- The Court grants the request to maintain under seal the identities of four third-party individuals alleged to be victims of sexual harassment, discrimination, or assault. "[T]he privacy interests of innocent third parties should weigh heavily in a court's balancing equation," *Mirlis v. Greer*, 952 F.3d 51, 61 (2d Cir. 2020), and here they outweigh the public interest in disclosure.

- The Court grants the request to maintain under seal certain details of the parties' personal and family medical histories, as their interest in the privacy of this information outweighs the right of public access.  *See United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995) ("In determining the weight to be accorded an assertion of a right of privacy, courts should first consider the degree to which the subject matter is traditionally considered private rather than public," such as "family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters.")

Additionally, the parties each propose redactions to which another party objects.  These are granted in part and denied in part, as follows:

- NY Doe 2 seeks to maintain under seal certain information related to her medical history in addition to the information Watson has agreed to maintain under seal.  This request is granted for the same reason the Court has granted sealing of other personal medical information.

- NY Doe 2 seeks to maintain under seal details of NY Doe 2's sexual history with individuals other than Watson. This request is justified under both Federal Rule of Evidence 412, which prohibits the unsealing of such information without an *in camera* hearing, and under *Lugosch*, to protect NY Doe 2's privacy interests and the interests of third parties.

- Watson seeks to maintain under seal certain emails to third parties. Watson does not provide authority for such sealing, and his requests to seal the entirety of the email exhibits do not appear narrowly tailored. These requests are therefore denied without prejudice.

The parties shall file the redacted versions of their filings (ECF Nos. 274-79, 281-84, 298-316) on the public docket **within two weeks of the date of this Orde**r, followed by a letter describing the materials that have been filed to ensure clarity on the docket.

With respect to Watson's emails to third parties, ECF Nos. 274-14 through 274-23, within **two weeks of the date of this Order**, Watson may file a request to redact sensitive or otherwise confidential information contained in these emails (such as the names and email addresses of third parties) from the public docket. Any such request may be made in the form of a letter brief not to exceed three (3) pages, with proposed redacted versions of ECF Nos. 217-14 through 217-23 attached as exhibits. The letter shall state the basis for the proposed redactions and cite to relevant authority. If no such request is filed, the Court will direct the Clerk of Court to unseal ECF Nos. 217-14 through 217-23. If any such request is filed, Defendants will have two weeks from the date of the sealing request to respond in a letter brief not to exceed three (3) pages, and the Court will maintain ECF Nos. 217-14 through 217-23 under seal pending resolution of Watson's request.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are **GRANTED** and Plaintiff's motion for partial summary judgment is **DENIED**. Watson's claims for defamation against each Defendant and for tortious interference against NY Doe 2 are dismissed.

Defendants shall submit any request for attorney's fees and costs with appropriate documentation on or before **October 17, 2025**.  Their publicly filed submission may be redacted for privileged matters, with an unredacted version submitted to the Court by email.  Plaintiffs may file any response on or before **October 31, 2025**.  By separate order, the Court will refer Defendants' request for attorney's fees to the Honorable Valerie Figueredo, the assigned Magistrate Judge in this case.

The Clerk of Court is respectfully requested to terminate ECF Nos. 274, 281, 321, and 325.

SO ORDERED.

Dated: September 17, 2025

New York, New York

DALE E. HO
United States District Judge