# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RALPH M. WATSON, an individual,

     Plaintiff,

     v.

NY DOE 2, an individual; NY DOE 3, an individual; NY DOE 4, an individual; ILLINOIS DOE 1, an individual; DOE COMPANY, an unknown business entity; DOE 1, an individual; and DOES 2 through 100, whose true names and capacities are unknown,

     Defendants.

Case No. 1:19-cv-533

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIMS AND GRANTING DEFENDANT NY DOE 2'S COUNTERCLAIM

## ORAL ARGUMENT REQUESTED

Kara V. Brandeisky
JENNER & BLOCK LLP
1099 New York Avenue
Washington, DC 20001
(202) 639-6000

Laura P. MacDonald
Rémi J.D. Jaffré
Susanna D. Evarts
Anna M. Windemuth
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
LMacDonald@jenner.com

*Counsel for Defendant NY Doe 2*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

STANDARD OF REVIEW ....................................................................................... 7

ARGUMENT .......................................................................................................... 8

    I.    New York's Anti-SLAPP Law Bars All Plaintiff's Claims.................................... 9

        A.    NY Doe 2's Statements Were in Connection with an Issue of Public Interest.................................................................................................. 10

        B.    Watson Has No Clear and Convincing Evidence That NY Doe 2 Made Her Statements with Actual Malice. ............................................ 10

    II.    Common Law Also Bars Watson's Defamation Claims. ................................... 13

        A.    NY Doe 2's CP+B Statement Was Privileged............................................ 13

        B.    NY Doe 2's DMA Statement Was About a Matter of Legitimate Public Concern.................................................................................................. 15

        C.    Watson Became a Limited-Purpose Public Figure When He Thrust Himself Into Controversy. ...................................................................... 16

        D.    Watson's Defamation Claims Fail Even Under a Negligence Standard... 17

    III.    Watson's Tortious Interference with Contract Claim Fails. ............................... 17

    IV.    NY Doe 2 Is Entitled to Judgment on Her Anti-SLAPP Counterclaim................ 19

CONCLUSION........................................................................................................ 20

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

CASES

*600 W. 115th St. Corp. v. Von Gutfeld*,
   603 N.E.2d 930 (N.Y. 1992) ................................................................................................9

*Albert v. Loksen*,
   239 F.3d 256 (2d Cir. 2001) ..........................................................................................8, 14

*Anderson v. Dimon*,
   No. CV 19-1153 (MN), 2020 WL 6392814 (D. Del. Nov. 2, 2020) .....................................19

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................................11

*Brimelow v. N.Y. Times Co.*,
   No. 21-66-CV, 2021 WL 4901969 (2d Cir. Oct. 21, 2021) ................................................11

*Brown v. Eli Lilly & Co.*,
   654 F.3d 347 (2d Cir. 2011) .................................................................................................7

*Bryks v. Canadian Broad. Corp.*,
   928 F. Supp. 381 (S.D.N.Y. 1996) ....................................................................................15

*Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc.*,
   749 N.Y.S.2d 249 (1st Dep't 2002) ...................................................................................18

*Chandok v. Klessig*,
   632 F.3d 803 (2d Cir. 2011) ...............................................................................................13

*Chapadeau v. Utica Observer-Dispatch*,
   341 N.E.2d 569 (N.Y. 1975) ........................................................................................15, 16

*Coleman v. Grand*,
   523 F. Supp. 3d 244 (E.D.N.Y. 2021), *appeal docketed*, No. 21-800 (2d Cir. Mar. 26,
   2021) .....................................................................................................................................9

*Contemp. Mission, Inc. v. N.Y. Times Co.*,
   842 F.2d 612 (2d Cir. 1988) ..................................................................................11, 16, 17

*Fine v. ESPN, Inc.*,
   No. 5:12-CV-0836 (DEP), 2016 WL 6605107 (N.D.N.Y. Mar. 25, 2016) ..........................11

*Frascatore v. Blake*,
   344 F. Supp. 3d 481 (S.D.N.Y. 2018) ...............................................................................15

ii

*Garson v. Hendlin*,
    532 N.Y.S.2d 776 (2d Dep't 1988)..........................................................................13

*Gottwald v. Sebert*,
    220 N.E.3d 621 (N.Y. 2023).................................................................................17

*Grass v. News Grp. Publ'ns, Inc*,
    570 F. Supp. 178 (S.D.N.Y. 1983).......................................................................16

*Harris v. Am. Acct. Ass'n.*,
    No. 22-811, 2023 WL 2803770 (2d Cir. Apr. 6, 2023), *cert. denied*, 144 S. Ct. 565
    (2024)......................................................................................................................20

*Hawkins v. N.Y. State Off. of Mental Health*,
    No. 17-CV-649 (NSR), 2019 WL 4520801 (S.D.N.Y. Sept. 19, 2019), *aff'd*, 845 F.
    App'x 9 (2d Cir. 2021)..........................................................................................11

*Konikoff v. Prudential Ins. Co. of Am.*,
    234 F.3d 92 (2d Cir. 2000)...................................................................................15

*Lee v. City of Rochester*,
    663 N.Y.S.2d 738 (N.Y. Sup. Ct. 1997), *aff'd*, 677 N.Y.S.2d 848 (4th Dep't 1998)..............17

*Liberman v. Gelstein*,
    605 N.E.2d 344 (N.Y. 1992).....................................................................13, 14, 15

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    13 F.4th 247 (2d Cir. 2021) ............................................................................11, 12

*McNally v. Yarnall*,
    764 F. Supp. 838 (S.D.N.Y. 1991).......................................................................18

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
    875 F.3d 107 (2d Cir. 2017)...................................................................................7

*Perks v. Town of Huntington*,
    251 F. Supp. 2d 1143 (E.D.N.Y. 2003) ................................................................16

*Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint Fire Dist.*,
    178 F. Supp. 3d 118 (S.D.N.Y. 2016)..............................................................14, 16

*Reeves v. Associated Newspapers, Ltd.*,
    210 N.Y.S.3d 25 (1st Dep't Apr. 9, 2024) ...........................................................19

*Rosenberg v. MetLife, Inc.*,
    866 N.E.2d 439 (N.Y. 2007).................................................................................13

*Schmidt & Schmidt, Inc. v. Town of Charlton,*
    962 N.Y.S.2d 393 (3d Dep't 2013)......................................................................18

*Scott v. Harris,*
    550 U.S. 372 (2007)...........................................................................................8

*St. Amant v. Thompson,*
    390 U.S. 727 (1968)..........................................................................................11

*Stillman v. Ford,*
    238 N.E.2d 304 (N.Y. 1968)..............................................................................18

*Travis v. Daily Mail,*
    185 N.Y.S.3d 655 (N.Y. Civ. Ct. 2023).............................................................10

*Wellner v. City of New York,*
    No. 16-CV-7032 (JGK), 2019 WL 1511022 (S.D.N.Y. Mar. 22, 2019)................8

*WG Glob. v. United Parcel Serv. Oasis Supply Corp.,*
    No. 11 CIVL 5697 JSR, 2012 WL 4840805 (S.D.N.Y. Sept. 25, 2012)..............17

*Zurich Am. Life Ins. Co. v. Nagel,*
    590 F. Supp. 3d 702 (S.D.N.Y. 2022).................................................................14

## Statutes

N.Y. Civ. Rights Law § 70-a .............................................................................7, 19, 20

N.Y. Civ. Rights Law § 76-a ...............................................................................7, 9, 10

## Court Rules

Fed. R. Civ. P. 8(b)(6)............................................................................................19

Fed. R. Civ. P. 56.................................................................................................2, 7

N.Y. C.P.L.R. 215(3) ................................................................................................8

## Other Authorities

5 Fed. Prac. & Proc. Civ. § 1279 (4th ed.)..............................................................19

Press Release, New York State Legislature, Senate and Assembly Majorities Advance
    Anti-SLAPP Legislation to Protect Free Speech (July 22, 2020),
    https://nyassembly.gov/Press/ files/20200722a.ph .............................................9

Restatement (Second) of Torts § 580B (1977) Comment g .......................................17

## INTRODUCTION

In October 2017, Alyssa Milano tweeted, "If you've been sexually harassed or assaulted write 'me too' as a reply to this tweet."[1]  In what is now known as the #MeToo movement, millions of women took to social media to speak their truth about the pervasiveness of sexual harassment and assault, and the ways in which perpetrators intimidate their victims into silence.  One of those women was NY Doe 2.[2]

NY Doe 2 was only 23 years old when she was hired as a junior-level creative at Crispin Porter & Bogusky ("CP+B"), an advertising agency in Boulder, Colorado.  Plaintiff Ralph Watson was the head of CP+B's entire creative department.  He was more than twice her age.  Watson sexually harassed NY Doe 2 while she was under his supervision and on probation at his directive.  Then, after NY Doe 2 left CP+B, Watson raped her following a gathering of CP+B alumni in New York City.

In the advertising industry, a group of anonymous individuals responded to the #MeToo movement by starting an Instagram account called Diet Madison Avenue ("DMA"), with the purpose of collecting stories of sexual abuse and discrimination in the profession.  Feeling a duty to protect other women, NY Doe 2 decided to message DMA about Watson.  DMA told NY Doe 2 that she was the *eighth* person to report Watson.  All the more concerned that Watson might harm someone else, NY Doe 2 decided to report Watson to the new leadership at CP+B.

On February 2, 2018, following several sexual harassment complaints within CP+B and public allegations published by DMA, CP+B fired Watson.  Watson retaliated by suing DMA and 100 Doe defendants in California state court, seeking $10 million in damages.  On May 24, 2018,

---

[1]  Alyssa Milano (@Alyssa_Milano), Twitter (Oct. 15, 2017, 4:21 PM), https://twitter.com/alyssa_milano/status/919659438700670976.

[2] NY Doe 2 is proceeding pseudonymously pursuant to a protective order.  *See* Dkt. 93.

DMA informed NY Doe 2 about the lawsuit and the media publicity Watson was generating. NY Doe 2 responded, "I'm so angry / Gloves are off. I don't care if the industry knows he raped me." After DMA published a screenshot of her message, Watson sued NY Doe 2 too.

For five years, Watson has weaponized the levers of litigation to silence, harass, and retraumatize NY Doe 2, subjecting his victim to invasive discovery, badgering questioning, and threats to reveal her identity. Meanwhile, discovery has confirmed what NY Doe 2 knew all along: that Watson's complaint was based on material lies. Under oath, Watson conceded that large parts of NY Doe 2's story were true. In contrast, Watson has not found a shred of evidence that NY Doe 2 has ever had reason to doubt what she said about him. Even Watson's own expert agrees that NY Doe 2 genuinely believes what she said about Watson. As a result, there is no triable issue of fact.

While this case was pending, New York passed a law giving defendants greater protections against "Strategic Lawsuits Against Public Participation" ("SLAPPs")—lawsuits brought to harass defendants and chill their freedom of expression. That law now compels summary judgment dismissing Watson's last remaining claims against NY Doe 2, for defamation and tortious interference with contract. Even without the anti-SLAPP law, Watson's claims would fail under bedrock defamation doctrine. After five years, enough is enough. NY Doe 2's motion for summary judgment should be granted, and NY Doe 2 should be awarded attorneys' fees.

## BACKGROUND

In July 2015, CP+B hired NY Doe 2 as an art director in its Boulder, Colorado office. SUF ¶ 1.[3] NY Doe 2 was 23 years old. *Id.* Watson was Chief Creative Officer at CP+B. *Id.* ¶ 3. He was 47 years old. *Id.* ¶ 2. Prior to joining CP+B, Watson held top creative roles at several

---

[3] NY Doe 2's Rule 56.1 Statement of Undisputed Facts ("SUF") is incorporated by reference.

distinguished advertising agencies and had received multiple awards for his work in advertising. *Id.* ¶ 4.  Watson has admitted that he exhibited inappropriate behavior toward NY Doe 2 while he was her supervisor and while she was on probation he had imposed.  *Id.* ¶¶ 5–8.  For example, Watson admitted that he engaged NY Doe 2 in conversation about sexual topics.  *Id.* ¶ 7.  Watson admitted that, after a night of drinking, he stripped down to his underwear and got into a hot tub with NY Doe 2, which he admitted was inappropriate.  *Id.* ¶ 8.  Once NY Doe 2 gave her two weeks' notice that she was leaving CP+B, Watson invited her out for drinks at a bar called Finkel & Garf Brewing Co., where, Watson admitted, he told NY Doe 2 that he liked her because she was "fucked up," and that he liked girls who have brown hair and brown eyes, as NY Doe 2 does.  *Id.* ¶¶ 9–11.  Watson admitted that he and NY Doe 2 kissed at Finkel & Garf.  *Id.* ¶ 12.  Watson admitted that he subsequently followed NY Doe 2 and another female junior CP+B employee back to NY Doe 2's apartment, where he stayed and smoked marijuana for over an hour.  *Id.* ¶¶ 13–14.[4] Although NY Doe 2 felt uncomfortable throughout all of these interactions with Watson, she did not want to offend him because of the power he wielded in the advertising industry at large.  *Id.* ¶ 16.  NY Doe 2 has said under oath that she genuinely felt sexually harassed by Watson.  *Id.* ¶ 18. NY Doe 2 left CP+B in December 2016.  *Id.* ¶ 6.

In February 2017, CP+B investigated Watson for sexual harassment.  *Id.* ¶¶ 19–22, 28. Among other things, a male CP+B employee reported that Watson had questioned a female subordinate about her sex life in front of a large group of her colleagues.  *Id.* ¶ 21.  CP+B Human Resources interviewed Watson about the accusation; Watson admitted it was true, and that his

---

[4] The other female junior CP+B employee confirmed that Watson followed them back from Finkel & Garf to NY Doe 2's apartment, although she did not witness the kiss between Watson and NY Doe 2 at Finkel & Garf, and she never talked to NY Doe 2 about NY Doe 2's perception of the events.  SUF ¶¶ 13, 15, 17.

behavior was "bad," "wrong," and "very inappropriate." *Id.* ¶¶ 22–24. Watson further admitted that he and NY Doe 2 had kissed at Finkel & Garf, although he accused NY Doe 2 of initiating the kiss. *Id.* ¶ 25. During the interview, Watson asked, "Am I fired?" and "Do I need a lawyer?" *Id.* ¶ 26. Around this time, CP+B Human Resources personnel separately contacted NY Doe 2, and NY Doe 2 reported some of Watson's inappropriate behavior toward her. *Id.* ¶ 27. At the conclusion of its investigation, CP+B gave Watson a formal warning. *Id.* ¶ 28.

On April 5, 2017, Watson texted NY Doe 2 to tell her that he was on his way to New York City, where NY Doe 2 now lived, to judge an advertising competition. *Id.* ¶ 32. Still mindful of Watson's stature in the industry, NY Doe 2 agreed to meet him and a group of former CP+B colleagues. *Id.* ¶ 33. On April 7, 2017, Watson, NY Doe 2, and others went out drinking at the Back Room Bar, and then went to dinner, where they drank some more. *Id.* ¶¶ 34–35. NY Doe 2 became intoxicated. *Id.* ¶ 36.

Watson has admitted that he then took NY Doe 2 up to his hotel room. *Id.* ¶ 37. NY Doe 2 did not want to engage in sexual activity with Watson, and was too intoxicated to consent to sexual activity with Watson. *Id.* ¶ 38. Watson has admitted that he kissed NY Doe 2 on the couch in his hotel room and that he had an e-cigarette, also known as a vape pen, with him in his hotel room. *Id.* ¶¶ 39–40. NY Doe 2 remembers sitting on the couch in Watson's hotel room. *Id.* ¶ 41. NY Doe 2 took a hit off his vape pen, and remembers feeling surprised by her level of intoxication. *Id.* ¶ 42. Aspects of NY Doe 2's memory are fragmented after that due to her intoxication. *Id.* ¶ 43. However, NY Doe 2 remembers Watson kissing her on the couch, Watson performing oral sex on her, and Watson's naked body on top of her naked body in his bed. *Id.* ¶ 44. The next morning, NY Doe 2 woke up in Watson's bed. *Id.* ¶ 45. NY Doe 2 could feel that some part of Watson's body had been inside of her body and "knew something was deeply wrong." *Id.* ¶¶ 46,

48.  Watson has admitted that NY Doe 2 woke up in his bed without all her clothes on.  *Id.* ¶ 45. NY Doe 2 genuinely believes that Watson raped her by having sex with her when she was too incapacitated to consent.  *Id.* ¶ 52.  NY Doe 2 has said so under oath.  *Id.*

In or around October 2017, a group of anonymous individuals started DMA to collect stories of sexual harassment and discrimination in the advertising industry.  *Id.* ¶ 54.  On January 12, 2018, at the urging of a former CP+B coworker who knew about Watson's sexual assault, NY Doe 2 decided to message DMA about Watson.  *Id.* ¶¶ 55–56.  NY Doe 2 recounted Watson's sexual harassment of her at CP+B and sexual assault in New York City.  *Id.* ¶ 56.  DMA told NY Doe 2 that she was the *eighth* person to contact DMA about Watson.  *Id.* ¶ 57.  On various dates throughout January 2018, DMA published a series of "stories" on Instagram, alleging, among other things, to have "[c]orroborated" reports that "Ralph Watson" was an "unrepentant serial predator" who "targeted & groomed" women who "were young & just starting out their careers."  *Id.* ¶ 58.

On January 24, 2018, CP+B convened an employee town hall regarding sexual harassment and discrimination.  *Id.* ¶ 60.  Afterwards, CP+B received a number of additional complaints about Watson, including reports from "a few people" about a widespread belief that employees had to sleep with Watson in order to be promoted.  *Id.* ¶ 61.  A male art director also reported his concerns that Watson denied him pay increases because he was openly gay.  *Id.* ¶ 63.  Also on January 24, 2018, CP+B interviewed Watson a second time as part of an investigation into sexual harassment complaints against him.  *Id.* ¶ 61.  Watson admitted in his deposition that he lied to CP+B in his interview about his sexual interactions with at least one other female CP+B employee.  *Id.* ¶ 62.

That same day, NY Doe 2's friend at CP+B put NY Doe 2 in touch with the new CP+B Director of Creative Management, Jan Jensen.  *Id.* ¶ 64.  NY Doe 2 spoke with Jensen by phone the next day, January 25, 2018.  *Id.* ¶ 65.  NY Doe 2 recounted to Jensen Watson's sexual

harassment of her at CP+B and sexual assault in New York City (hereinafter, the "CP+B Statement"). *Id.* ¶ 66. In his deposition, Watson admitted that NY Doe 2 had a duty to report his behavior to CP+B if she felt it was inappropriate. *Id.* ¶ 69.

On February 2, 2018, CP+B fired Watson. *Id.* ¶ 70. CP+B later told Watson's attorney that its decision was based on its "in-depth investigation of allegations of misconduct by several current and former employees," as well as "identification of emails that were sent by Mr. Watson." *Id.* ¶ 71. On May 22, 2018, Watson filed the first of three lawsuits arising out of this matter, suing DMA and 100 Doe defendants for defamation and related torts in California Superior Court, seeking not less than $10 million in damages. *Id.* ¶ 73. On May 23, 2018, Watson published an open letter defending himself on his attorney's website, and Watson's attorney made statements on Watson's behalf to the press. *Id.* ¶¶ 74, 76.

On May 24, 2018, DMA messaged NY Doe 2 about Watson's California lawsuit and sent her an article quoting Watson's attorney. *Id.* ¶¶ 78–79. DMA wrote, "We really don't think that this will go anywhere / But where do you stand if it does." *Id.* ¶ 80. NY Doe 2 responded, "I don't think so either. But if it does ... I'm so angry / *Gloves are off. I don't care if the industry knows he raped me*" (emphasis added) (ellipses in original). *Id.* ¶ 81. DMA posted this statement to Instagram as a "story" (hereinafter, the "DMA Statement"). *Id.* ¶ 82.

On June 29, 2018, Watson filed his second of three lawsuits arising out of this matter, suing CP+B and related parties for breach of contract, employment discrimination, and other torts in the U.S. District Court for the District of Colorado, again seeking not less than $10 million in damages. *Id.* ¶¶ 83–85. The lawsuit was then moved to arbitration. *Id.* ¶ 86. Despite previously having asked Jensen for anonymity, on or around October 22, 2018, NY Doe 2 agreed to allow CP+B to reveal her identity to Watson in the context of that arbitration. *Id.* ¶ 87. NY Doe 2, through her

attorneys, provided a statement for use in the arbitration describing the events she had substantially conveyed to Jensen several months earlier about the sexual harassment and assault Watson perpetrated. *Id.* ¶ 88.

On January 17, 2019, Watson brought the instant suit against NY Doe 2 and others. Compl., Dkt. 1. On February 11, 2020, Judge John G. Koeltl dismissed all defendants except NY Doe 2 and Illinois Doe 1 and dismissed all claims against NY Doe 2 except defamation and tortious interference with contract. Opinion & Order, Dkt. 99. On October 8, 2021, NY Doe 2 amended her answer to assert a counterclaim for attorneys' fees and costs pursuant to N.Y. Civil Rights Law § 70-a and § 76-a. Am. Answer, Dkts. 204 & 205. On October 6, 2023, Judge Koeltl denied Watson's motion to dismiss NY Doe 2's counterclaim. Opinion & Order, Dkt. 249. Watson never filed an answer to NY Doe 2's counterclaim.

NY Doe 2 now moves for summary judgment dismissing Watson's claims of defamation and tortious interference, and granting her counterclaim.

## STANDARD OF REVIEW

Summary judgment "must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). Where, as here, "the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted). "The mere existence of *some* alleged factual dispute between the parties will

7

not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550

U.S. 372, 380 (2007) (alteration and citation omitted).

## ARGUMENT

Although Watson's pleadings lack clarity, Watson appears to allege that NY Doe 2 made

two defamatory statements: (1) an oral statement to Jensen on January 25, 2018 that Watson "had

sexually assaulted her" (the CP+B Statement), and (2) a written statement to DMA that was posted

on Instagram on May 24, 2018: "Gloves are off. I don't care if the industry knows he raped me"

(the DMA Statement). Opinion & Order, Dkt. 99, at 16–17.[5] Under New York law, the elements

of defamation are: (1) "a defamatory statement of fact," (2) "that is false," (3) "published to a third

party," (4) "'of and concerning' the plaintiff," (5) "made with the applicable level of fault on the

part of the speaker," (6) "either causing special harm or constituting [defamation] per se," and (7)

"not protected by privilege." *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir. 2001).

Watson will argue that he is entitled to a jury trial on the second element: falsity. While

NY Doe 2's statements were in fact true, for purposes of summary judgment, that is beside the

point. NY Doe 2 is entitled to judgment as a matter of law because Watson cannot prove essential

elements of defamation. Namely, the undisputed facts demonstrate that NY Doe 2 did not act with

any applicable level of fault—whether it be actual malice, common law malice, gross

irresponsibility, or negligence—with respect to either the DMA Statement or the CP+B Statement.

Further, whatever NY Doe 2 said to Jensen in the CP+B Statement was privileged. Since Watson's

tortious interference claim rises or falls on whether the CP+B Statement was defamatory, Watson's

---

[5] In response to contention interrogatories, Watson raised over a dozen other allegedly defamatory statements that are not in the Amended Complaint and thus may not be considered by the Court. *See Wellner v. City of New York*, No. 16-CV-7032 (JGK), 2019 WL 1511022, at *3 (S.D.N.Y. Mar. 22, 2019) (finding a defendant was not required to address a defamation theory not found in the complaint). In any event, these additional allegedly defamatory statements would fall outside the one-year statute of limitations, *see* N.Y. C.P.L.R. 215(3), or fail on other grounds.

failure to establish these elements is fatal to his entire case.  NY Doe 2 is entitled to summary judgment.

## I.     NEW YORK'S ANTI-SLAPP LAW BARS ALL PLAINTIFF'S CLAIMS.

SLAPPs are lawsuits that have "little legal merit but are filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future."  *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 933 n.1 (N.Y. 1992).  In 2020, New York amended its anti-SLAPP statute to broaden the definition of a SLAPP to include any lawsuit based on "any communication in a place open to the public or a public forum in connection with an issue of public interest" or "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition."  N.Y. Civ. Rights Law § 76-a(1)(a).  "'Public interest' shall be construed broadly, and shall mean any subject other than a purely private matter."  *Id.* § 76-a(1)(d).

The Second Circuit has yet to provide clear guidance on how this amendment should be applied.  *See, e.g.*, *Coleman v. Grand*, 523 F. Supp. 3d 244, 258 (E.D.N.Y. 2021), *appeal docketed*, No. 21-800 (2d Cir. Mar. 26, 2021).  But this case is exactly the kind of meritless, retaliatory action that the New York legislature was trying to address.  Indeed, a legislative sponsor of the recent amendment to the statute said that one of the purposes of the anti-SLAPP law is to protect "survivors of sexual abuse" from "being dragged through the courts on retaliatory legal challenges solely intended to silence them."[6]

In order to prevail in a SLAPP action, the plaintiff must prove "by clear and convincing

---

[6] Press Release, New York State Legislature, Senate and Assembly Majorities Advance Anti-SLAPP Legislation to Protect Free Speech (July 22, 2020), https://nyassembly.gov/Press/files/20200722a.php.

evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false." *Id.* § 76-a(2).  In other words, the plaintiff must demonstrate with clear and convincing evidence that the defendant had what the Supreme Court in *New York Times v. Sullivan* termed "actual malice."  376 U.S. 254, 279–80 (1964).  Because Watson cannot do so, NY Doe 2 is entitled to summary judgment.

**A. NY Doe 2's Statements Were in Connection with an Issue of Public Interest.**

The statements at the heart of this case were indisputably "in connection with an issue of public interest."  N.Y. Civ. Rights Law § 76-a(1)(a).  "[C]ourts have regularly found that accounts or allegations of sexual assault, harassment or other impropriety constitute matters of public interest" for purposes of the anti-SLAPP statute.  *Travis v. Daily Mail*, 185 N.Y.S.3d 655, at *3 (N.Y. Civ. Ct. 2023) (collecting cases).

NY Doe 2's statements concerned sexual harassment and sexual assault, in the workplace generally and the advertising industry specifically.  Moreover, NY Doe 2's DMA Statement was published on Instagram, which additionally made it a communication in a "public forum" protected by the anti-SLAPP statute.  N.Y. Civ. Rights Law § 76-a(1)(a)(1).  For those reasons, as Judge Koeltl has already found in this case, "NY Doe 2's statements involved an issue of public interest," and the anti-SLAPP statute therefore applies.  Opinion & Order, Dkt. 249, at 15.

**B. Watson Has No Clear and Convincing Evidence That NY Doe 2 Made Her Statements with Actual Malice.**

Watson must thus prove "by clear and convincing evidence" that NY Doe 2 made each statement "with knowledge of its falsity or with reckless disregard of whether it was false."  N.Y. Civ. Rights Law § 76-a(2).  "Reckless disregard" is not measured by whether "a reasonably prudent" person would have made the statement, but rather whether there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth."  *St.*

*Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Clear and convincing evidence "satisfies the factfinder that it is highly probable that what is claimed actually happened" and "is neither equivocal nor open to opposing presumptions." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 260 (2d Cir. 2021) (citation omitted).

"[W]here the factual dispute concerns actual malice," summary judgment must be granted to the defendant if the evidence in the record could not "support a reasonable jury finding . . . that the plaintiff has shown actual malice by clear and convincing evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986).  To defeat such a summary judgment motion, a plaintiff cannot merely assert that "the jury might, and legally could, disbelieve the defendant's denial" of actual malice, but must rather assert "[s]ome facts . . . to support the claim that the state of mind existed." *Contemp. Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621–22 (2d Cir. 1988) (citations omitted).  A plaintiff's "independent and unsupported belief" that a defendant acted with actual malice is insufficient to raise a triable issue of fact. *Fine v. ESPN, Inc.*, No. 5:12-CV-0836 (DEP), 2016 WL 6605107, at *14 (N.D.N.Y. Mar. 25, 2016).

Here, Watson has no evidence—much less clear and convincing evidence—that NY Doe 2 spoke with actual malice.  NY Doe 2 testified under oath that she believes her statements and stands by them.  SUF ¶ 57.  Watson's *own expert* agrees that NY Doe 2 sincerely believes what she is saying. *Id.* ¶ 58.  That Watson has separately denied some of NY Doe 2's accusations under oath is of no import.  "It is well settled that denials without more do not support a plausible claim of actual malice," *Brimelow v. N.Y. Times Co.*, No. 21-66-CV, 2021 WL 4901969, at *3 (2d Cir. Oct. 21, 2021), and that self-serving and uncorroborated testimony is insufficient to create a genuine issue of material fact, *see, e.g.*, *Hawkins v. N.Y. State Off. of Mental Health*, No. 17-CV-649 (NSR), 2019 WL 4520801, at *12 (S.D.N.Y. Sept. 19, 2019) (collecting cases), *aff'd*, 845 F.

App'x 9 (2d Cir. 2021).

Throughout this case, Watson has repeated the same tired, sexist myths used to discredit victims of sexual assault for decades.  For example, Watson has claimed that the fact that NY Doe 2 ordered room service and watched a movie the day after her assault, and that she maintained contact with Watson in the months after—including by wishing him a happy Thanksgiving—is "objective evidence that NY Doe 2 was not sexually assaulted."  Dkt. 222, at 7; *see also* SUF ¶¶ 47, 49–50.  But, as NY Doe 2's expert Dr. Sarah Boyd has opined, victims of sexual assault often engage in coping behaviors that seem "counterintuitive" to others.  SUF ¶ 51.  For example, it is well-documented that victims commonly initiate and maintain social contact with the perpetrator, especially when the victim knew the perpetrator beforehand.  *Id.*  Accordingly, what Watson calls "objective evidence" that he did not assault NY Doe 2 is instead at best "open to opposing presumptions," and falls far short of clear and convincing evidence.  *Loreley Fin.*, 13 F.4th at 260 (citation omitted).

At base, NY Doe 2 had no actual malice because she is telling the truth.  Indeed, Watson's account of the relevant events largely mirrors NY Doe 2's.  Watson admitted that while he was NY Doe 2's supervisor, he engaged in behavior that was inappropriate.  SUF ¶¶ 7–8.  He admitted that after NY Doe 2 put in her two weeks' notice, he invited her out for a drink at Finkel & Garf, where he and NY Doe 2 kissed.  *Id.* ¶¶ 9, 12.  Watson further admitted that on April 7, 2017, he and NY Doe 2 went out drinking on the Lower East Side with several other people.  *Id.* ¶ 34.  He admitted that he took NY Doe 2 to his hotel room, where he kissed her on his couch.  *Id.* ¶¶ 37, 39.  He admitted that NY Doe 2 woke up in his bed without all of her clothes on.  *Id.* ¶ 45.

*The only point where Watson's story meaningfully diverges from NY Doe 2's* is on the night of April 7, 2017, the time between when Watson kissed NY Doe 2 on his couch and she woke up

in his bed.  During this time, NY Doe 2 sincerely and reasonably believes Watson raped her.  *Id.* ¶ 52.  NY Doe 2 said so to CP+B and DMA—at great personal cost—because she wanted to protect other women.  *Id.* ¶¶ 66–67.  She has since said so under oath.  *Id.* ¶ 52.  Watson cannot prove by clear and convincing evidence that NY Doe 2 did not believe what she said and, accordingly, his claims against her must now be dismissed in their entirety.

## II.    COMMON LAW ALSO BARS WATSON'S DEFAMATION CLAIMS.

Even if the Court determines that the amended anti-SLAPP statute does not apply, Watson's claims must still be dismissed under black-letter defamation law.

### A.  NY Doe 2's CP+B Statement Was Privileged.

New York "public policy mandates that certain communications, although defamatory, cannot serve as the basis for the imposition of liability in a defamation action."  *Rosenberg v. MetLife, Inc.*, 866 N.E.2d 439, 442 (N.Y. 2007) (alteration and citation omitted).  New York affords a qualified privilege to any statement "fairly made by a person in the discharge of some public or private duty, legal or moral."  *Id.* (citation omitted).  This moral-duty privilege is not "confined to legal duties, but must include moral and social duties of imperfect obligation."  *Garson v. Hendlin*, 532 N.Y.S.2d 776, 779 (2d Dep't 1988) (citation omitted).  New York also extends a qualified privilege to any "communication made by one person to another upon a subject in which both have an interest."  *Liberman v. Gelstein*, 605 N.E.2d 344, 349 (N.Y. 1992) (citation omitted).  The moral-duty privilege and common-interest privilege may overlap, and defamatory statements subject to one or both qualified privileges are only actionable if the plaintiff establishes actual or common-law malice by a preponderance of the evidence.  *See Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011).

To encourage employees to speak freely to their employers about workplace misconduct, "allegations of employee misconduct" are a paradigmatic example of statements considered

privileged under New York law. *Loksen*, 239 F.3d at 268, 272 (collecting cases). Here, it is undisputed that NY Doe 2 had a "duty to report" Watson's inappropriate behavior to CP+B. SUF ¶ 69. Even in absence of such a duty, NY Doe 2 and CP+B shared a "common interest in identifying and addressing inappropriate conduct taken in the course of [Watson's] employment." *Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702, 727 (S.D.N.Y. 2022). Because NY Doe 2 spoke to Jensen in connection with CP+B's investigation into Watson's inappropriate behavior, SUF ¶¶ 61, 66, the CP+B Statement was subject to a qualified privilege.

To overcome the privilege, Watson must demonstrate that NY Doe 2 spoke with malice, which he cannot do. He cannot establish actual malice, for the reasons previously explained. Nor is there any triable issue of fact with respect to common law malice. Under New York law, "a triable issue" of common law malice "is raised only if a jury could reasonably conclude" that spite was the speaker's "one and only" "motivation for making the defamatory statements." *Liberman*, 605 N.E.2d at 350. "If the defendant's statements were made to further the interest protected by the privilege," it does not matter if the speaker also "harbored ill will toward" the plaintiff. *Id.*; *see also Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint Fire Dist.*, 178 F. Supp. 3d 118, 161 (S.D.N.Y. 2016) (collecting cases). "[S]peculation or suspicion" as to the defendant's malice is insufficient to defeat the common-interest privilege on summary judgment. *Zurich Am. Life Ins. Co.*, 590 F. Supp. 3d at 727.

The evidence overwhelmingly demonstrates that NY Doe 2 made the CP+B Statement out of a sense of duty, feeling it was the "only way to protect" other women at CP+B and ensure that Watson "won't be able to do this to anyone else." SUF ¶¶ 59, 67. In messages to friends, NY Doe 2 explained, "i can't sit by and not say something. / that's why i came forward about ralph," *id.* ¶ 67, and "the only way to protect anyone was to tell my truth," *id.* In her deposition, NY Doe 2

14

explained that she made the CP+B Statement because she believed that "new HR leadership" was "trying to make Crispin a better and safer place for everyone." *Id.* In other words, NY Doe 2 made the CP+B Statement in furtherance of her duty to CP+B, and because of her common interest with CP+B, *id.* ¶ 68, to assist CP+B in addressing sexual misconduct in the workplace. *See Liberman*, 605 N.E.2d at 350. In light of this factual record, Watson cannot show that NY Doe 2 made the CP+B Statement out of spite toward him, much less that spite was NY Doe 2's "one and only" motivation. *Id.* Therefore, Watson cannot present a triable issue of fact regarding malice sufficient to overcome the qualified privilege, and summary judgment must be granted as to the CP+B Statement.

### B. NY Doe 2's DMA Statement Was About a Matter of Legitimate Public Concern.

The DMA Statement is separately protected under New York law. If an allegedly defamatory statement is "arguably within the sphere of legitimate public concern," then the plaintiff must establish, by a preponderance of the evidence, that the defendant "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch*, 341 N.E.2d 569, 571 (N.Y. 1975). Even before the #MeToo era, courts recognized that "allegations of sexual assault" can be "'of legitimate public interest and concern.'" *Bryks v. Canadian Broad. Corp.*, 928 F. Supp. 381, 383 (S.D.N.Y. 1996). Courts have "uniformly applied *Chapadeau* to cases involving non-media defendants." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 101 (2d Cir. 2000) (collecting cases).

NY Doe 2 said what she reasonably believes to be true: that Watson raped her. A speaker does not act in a grossly irresponsible manner by "recounting his own subjective recollection." *Frascatore v. Blake*, 344 F. Supp. 3d 481, 497 (S.D.N.Y. 2018). New York law recognizes that it is not grossly irresponsible to make statements "based upon [one's] personal knowledge," and

"New York law does not task [speakers] with going out to find a second opinion." *Ratajack*, 178

F. Supp. 3d 118 at 171 (granting summary judgment under *Chapadeau*, among other reasons).

Summary judgment must independently be granted under *Chapadeau* as to the DMA Statement.

## C. Watson Became a Limited-Purpose Public Figure When He Thrust Himself into Controversy.

With respect to the DMA Statement, Watson needs clear and convincing evidence of actual

malice for the additional reason that Watson is a "limited purpose public figure." *Contemp.*

*Mission*, 842 F.2d at 617–18. Plaintiffs like Watson who have "openly availed themselves of the

media, issuing press releases [and] making public statements," become public figures "with respect

to a particular controversy." *Id.* at 617–21; *see also Perks v. Town of Huntington*, 251 F. Supp. 2d

1143, 1168 (E.D.N.Y. 2003). A day after suing DMA in California Superior Court, Watson

published an open letter through his attorney "[c]hoosing to speak up" and accusing DMA of

orchestrating a "one-sided trial by social media" against alleged sexual assaulters. SUF ¶ 74.

Watson's letter was reported on and quoted in various media outlets. *Id.* ¶ 75. Watson has

continued to speak to the press through his counsel, including to general interest publications like

*The New York Times*. *Id.* ¶ 77.[7]

NY Doe 2 made the DMA Statement directly in response to Watson's decision to seek

publicity. The DMA Statement was a response to DMA's messages telling NY Doe 2 that Watson

had sued DMA and that Watson's suit had attracted media attention. SUF ¶¶ 79–81. The DMA

Statement thus was not only commenting on Watson's sexual abuse, but also on Watson's decision

to leverage the court system and the media to intimidate and silence his critics. Having

"successfully invited public attention to his views in an effort to influence others prior to the

---

[7] In determining whether an individual has injected himself into a public controversy, courts also consider statements made on behalf of an individual. *See, e.g.*, *Grass v. News Grp. Publ'ns, Inc*, 570 F. Supp. 178, 183 (S.D.N.Y. 1983).

16

incident that is the subject of litigation," Watson made himself a limited-purpose public figure for purposes of the DMA Statement and therefore must prove actual malice by clear and convincing evidence. *Contemp. Mission*, 842 F.2d at 617–18. As previously explained, he cannot do so, and thus his claim based on the DMA Statement must be dismissed.

### D. Watson's Defamation Claims Fail Even Under a Negligence Standard.

Even assuming no heightened burden applies, at minimum, Watson must demonstrate that NY Doe 2 was negligent in making her statements, *see Gottwald v. Sebert*, 220 N.E.3d 621, 627 (N.Y. 2023), meaning that NY Doe 2 did not have "reasonable grounds for believing" that her statements were true, *see* Restatement (Second) of Torts § 580B (1977) cmt. g. "As in other negligence contexts, 'general awareness' of the possibility of untruthfulness should not be enough." *Lee v. City of Rochester*, 663 N.Y.S.2d 738, 754 (N.Y. Sup. Ct. 1997) (granting summary judgment because the defamation plaintiff could raise no material issue of fact as to negligence), *aff'd*, 677 N.Y.S.2d 848 (4th Dep't 1998).

NY Doe 2 made both the CP+B Statement and the DMA Statement based on what she personally experienced. It cannot be unreasonable for her to bear witness to her own life. Therefore, Watson can raise no triable issue of fact as to negligence, and Watson's defamation claims must be dismissed under even the lowest burden of fault.

## III.   WATSON'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM FAILS.

Because Watson's defamation claims fail, his tortious interference with contract claim must fail too. To prevail on that claim, Watson must prove that NY Doe 2's conduct "amount[ed] to a crime or an independent tort," involved "malice," or involved "wrongful means" such as "violence, fraud or misrepresentation, civil suits and criminal prosecutions." *WG Glob. v. United Parcel Serv. Oasis Supply Corp.*, No. 11 CIVL 5697 JSR, 2012 WL 4840805, at *8 (S.D.N.Y. Sept. 25, 2012) (citations omitted). Consequently, a plaintiff's ability to recover for tortious

interference "stands or falls on his ability to make a sufficient showing of independently tortious conduct." *Stillman v. Ford*, 238 N.E.2d 304, 307 n.3 (N.Y. 1968). Where a plaintiff's tortious interference claim is "based entirely" on allegedly defamatory statements, as Watson's is, "the court's holdings on the defamation claims determine the tortious interference claims" as well. *McNally v. Yarnall*, 764 F. Supp. 838, 853 (S.D.N.Y. 1991).

Even if Watson had a viable defamation claim, his tortious interference claim would still fail because the CP+B Statement was not the "but for" cause of Watson's firing. An "essential element" of the claim is that the relevant breach of contract "would not have occurred but for the activities of the defendant." *Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc.*, 749 N.Y.S.2d 249, 249 (1st Dep't 2002). Where a plaintiff cannot demonstrate but-for causation, the defendant is entitled to summary judgment. *See, e.g.*, *Schmidt & Schmidt, Inc. v. Town of Charlton*, 962 N.Y.S.2d 393, 397 (3d Dep't 2013).

Before NY Doe 2 made the CP+B Statement, CP+B's human resources department had already documented several complaints against Watson based on his misconduct and sexual impropriety. SUF ¶¶ 19–21, 27–28, 61, 63, 71. DMA claimed to have received complaints from eight other women. *Id.* ¶ 57. A male subordinate had separately accused Watson of discrimination on the basis of sexual orientation. *Id.* ¶ 63. Watson had sent inappropriate emails to colleagues using his CP+B account. *Id.* ¶¶ 29–31, 71. Watson lied to CP+B in his interview about his sexual interactions with at least one other female CP+B employee. *Id.* ¶ 62. CP+B therefore had ample reason to fire Watson regardless of NY Doe 2's statements. Watson even conceded that he engaged in some of the "very inappropriate" conduct that gave rise to the complaints, *id.* ¶ 24, and that he suspected Jensen—not NY Doe 2—of shoring up evidence to fire him because she was "not a fan" of his, *id.* ¶ 72. Alternatively, Watson pleaded to another court that the real reasons

18

for his termination were age and gender discrimination by CP+B.  *Id.* ¶¶ 84–85.  Watson therefore

falls woefully short of satisfying his burden at summary judgment.

## IV.   NY DOE 2 IS ENTITLED TO JUDGMENT ON HER ANTI-SLAPP COUNTERCLAIM.

New York's anti-SLAPP statute creates a cause of action for the victim of a SLAPP suit to

recover against the plaintiff.  A defendant in a SLAPP suit "may maintain an action, claim, cross

claim or counterclaim to recover damages, including costs and attorney's fees, from any person

who commenced or continued such action."  N.Y. Civ. Rights Law § 70-a(1).  Indeed, an award

of attorney's fees is mandatory "upon a demonstration" that the SLAPP action "was commenced

or continued without a substantial basis in fact and law and could not be supported by a substantial

argument for the extension, modification or reversal of existing law."  *Id.* § 70-a(1)(a).

As an initial matter, because Watson failed to file an answer, the factual allegations in NY

Doe 2's counterclaim should be deemed admitted pursuant to Federal Rule of Civil Procedure

8(b)(6).  *See* 5 Fed. Prac. & Proc. Civ. ("Wright & Miller") § 1279 (4th ed.); *Anderson v. Dimon*,

No. CV 19-1153 (MN), 2020 WL 6392814, at *3 (D. Del. Nov. 2, 2020) (collecting cases).

Regardless, under the anti-SLAPP statute, "substantial basis in fact and law" "means 'such

relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate

fact.'"  *Reeves v. Associated Newspapers, Ltd.*, 210 N.Y.S.3d 25, 31, 28 (1st Dep't Apr. 9, 2024)

(quoting *Smartmatic USA Corp. v. Fox Corp.*, 183 N.Y.S.3d 402, 404 (1st Dept. 2023)).  One

"practical test" "[i]n applying the 'substantial basis' standard," is to ask "whether the allegations

and evidence presented would require submission to a jury as a question of fact."  *Id.* at 36 (citation

omitted).  In other words, the substantial basis test "has been equated with the ordinary summary

judgment standard, in that each seeks to determine whether there are triable issues of material

fact."  *Id.*  Therefore, if the Court finds no triable issues of material fact and dismisses Watson's

19

claims against NY Doe 2, that means Watson has necessarily continued a SLAPP action "without a substantial basis in fact and law," and NY Doe 2 is entitled to summary judgment on her anti-SLAPP counterclaim as well.

Indeed, Watson's claims have never had any basis in fact and law. From the start, Watson's complaint was based on materially false allegations. Watson claimed to have "a history of no complaints of sexual impropriety against him," Dkt. 47 at ¶ 34; Watson has since admitted under oath that there were multiple complaints, SUF ¶ 19. Watson claimed to have "never been interviewed as part of any investigation," Dkt. 47 at ¶ 37; he had been interviewed not once, but twice, SUF ¶¶ 22, 61. Watson claimed to have "never been disciplined for any type of improper behavior, including sexual harassment and/or for creating a hostile work environment," Dkt. 47 at ¶ 33; CP+B gave him a warning about his inappropriate behavior a year before his termination, SUF ¶ 28. A claim borne out of materially false allegations both lacks "a substantial basis in fact and law" and cannot plausibly "be supported by a substantial argument for the extension, modification or reversal of existing law." N.Y. Civ. Rights Law § 70-a(1)(a).

After over five years of litigation and ample opportunity for discovery, it has become overwhelmingly obvious that Watson's lawsuit is not based in fact and law but is instead a scorched-earth effort to intimidate, silence, and punish NY Doe 2 for speaking out truthfully against him. This is exactly the "sort of abuse New York's anti-SLAPP statute was designed to prevent." *Harris v. Am. Acct. Ass'n.*, No. 22-811, 2023 WL 2803770, at *3 n.3 (2d Cir. Apr. 6, 2023), *cert. denied*, 144 S. Ct. 565 (2024). NY Doe 2 is entitled to judgment on her anti-SLAPP counterclaim, an award of attorneys' fees, and an end to Watson's harassment.

## CONCLUSION

Based on the foregoing, NY Doe 2's motion for summary judgment should be granted.

Dated:    New York, New York
          July 19, 2024

                                        Respectfully submitted,

                                        By:  */s/ Laura P. MacDonald*

          Kara V. Brandeisky             Laura P. MacDonald
          JENNER & BLOCK LLP             Rémi J.D. Jaffré
          1099 New York Avenue           Susanna D. Evarts
          Washington, DC 20001           Anna M. Windemuth
          (202) 639-6000                 JENNER & BLOCK LLP
                                         1155 Avenue of the Americas
                                         New York, NY 10036
                                         (212) 891-1600
                                         LMacDonald@jenner.com

                                         *Counsel for Defendant NY Doe 2*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 19, 2024, I electronically filed the foregoing with the Clerk of

Court, to be served on all parties of record via the CM/ECF system.

*/s/ Laura P. MacDonald*
Laura P. MacDonald
